[No. H017020. Sixth Dist. June 7, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
GINA MILLER et al., Defendants and Appellants.

**[Opinion certified for partial publication.*]**

---

*This opinion is certified for publication with the exception of parts 5 and 6 of the part entitled Sufficiency of the Evidence of False Pretense; and the following parts entitled Access Card Forgery, Dissuading a Witness or Victim, Escape, Owen's Statements, Accomplice Testimony Instructions, and Motion Claiming Invidious Prosecution.

1428

**COUNSEL**

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant Gina Miller.

Arthur Dudley, under appointment by the Court of Appeal, for Defendant and Appellant Nicolas Harris.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Stan M. Helfman and Christopher W. Grove, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**PREMO, J.**—Codefendants Gina Miller and Nicolas Harris appeal judgment after a jury convicted them of stealing over $150,000 by false pretenses from two elderly single men and then attempting to dissuade one of the victims from testifying against them. On appeal they challenge the admissibility and sufficiency of the evidence and the jury instructions. Miller also claims discriminatory prosecution. We affirm.

FACTS

We view the record in the light most favorable to the People, as we are bound to do after a guilty verdict. (*People v. Sweeney* (1960) 55 Cal.2d 27, 33 [9 Cal.Rptr. 793, 357 P.2d 1049].) This case grew out of the grand theft by false pretenses of large amounts of money and property from Nicholas Brayevich and Wilbur Johnston. Evidence of three uncharged similar incidents involving Ned Wyss, Robert Dodd, and Jack McCallister was admitted to show a common scheme or plan. (Evid. Code, § 1101, subd. (b).) The facts are much abridged; more detail will be forthcoming as needed for the discussion of a particular issue.

*Nicholas Brayevich, Counts 1-4*

In September 1994, 84-year-old bachelor Nicholas Brayevich shared a house with his sister Stella in the Willow Glen area of San Jose. The day

after Stella was moved into a convalescent hospital and Brayevich was left alone in their house, defendant Miller, a total stranger, approached him as he was gardening, identified herself as Selena Bay, and asked to use his bathroom. Brayevich allowed her to do so, and after she came out the two stood in the kitchen and talked.

Miller repeated the visit a few days later, and continued to visit Brayevich, uninvited, on a regular basis. She arrived and left by taxi and did not explain the reason for her visits. From questioning Brayevich, she found out that one of his sisters was dead and the other was in a convalescent hospital. She asked whether he was lonely. She told him that she was from Greece and was alone in this country. She said she had no family and she was single, a virgin, and that she also lived alone.

The second time Miller came to Brayevich's house, he saw her "opening drawers and shuffling through clothing and this and that, looking in the closets." Brayevich "should have objected," but he thought she was "young" and "innocently curious." Nevertheless, he also thought she was "quite audacious," rummaging through drawers where he kept his business records.

Once, he was surprised to see Miller at the convalescent hospital standing at the door of Stella's room looking in at her. Miller had not accompanied Brayevich to the hospital nor had she told him she was planning to go there.

About the sixth or seventh time Miller visited Brayevich, she brought along codefendant Harris, whom she introduced as "Sam," an "old" and, she implied, undesirable, friend from Los Angeles. She never admitted Harris was her boyfriend and "scoffed at the idea" when Brayevich asked if she were married to him.

In reality, she was living with defendant Harris "as husband and wife" along with her two children, three-year-old Moses and four- or five-year-old Eric. Harris had been her boyfriend for four or five years and they had lived together in Los Angeles, San Carlos, and at several addresses each in Sunnyvale, San Jose, and Campbell.

Brayevich regularly received money from his investments and had accounts at Bank of the West, American Savings, and Smith Barney, among other financial institutions. He lived frugally, paying cash or "do[ing] without." He did not shop at expensive stores like Nordstrom's, Macy's, or the Emporium. Miller convinced him to apply for credit cards, and to take her shopping at various department stores. She "knew the best places" to shop. "Generally I followed her like a faithful puppy and she would go ahead of me and do the shopping."

Miller asked for and received cash (she had a "liking for hundred dollar bills"), which Brayevich took from bank accounts, his Smith Barney account, and as cash advances on his recently acquired American Express and Union 76 credit cards. The cash amounts ranged from $500 to $25,000.

Miller also asked for and received a cashier's check for $51,815 for a down payment on a house, a $45,000 Chevy Suburban (to which Brayevich retained title in his name), almost $8,000 for a 1977 Mercedes convertible and a new top, a television set and stereo equipment costing $5,651.95, and a $21,249.40 diamond "engagement" ring. Miller told Brayevich the ring would make their relationship more "bonding" or "binding."

Brayevich never intended to marry Miller even though she talked about doing so. Brayevich admitted to a "sexual" relationship with Miller, but it consisted of hugging, kissing, and back rubbing. Miller always wore underwear, at least, and there was no sexual intercourse. Brayevich spent money on Miller because he wanted to "put a hold on her" and keep her affection.

In addition, Brayevich gave Harris cash because he thought Miller wanted him to and paid credit card bills for vehicle rentals, airplane tickets, jewelry, clothing, and other articles, run up by Miller and Harris without permission.

Brayevich eventually realized defendants were engaged in a "skin game" and they "were out to get as much money" as possible from him. He would never have maintained the relationship and he would not have given Miller and Harris money if he had known that Miller used different names, had two children, and was living with Harris.

The "gig [was] up" as Brayevich put it when Brayevich's nephew and next-door neighbor, Ilko Vucia, called the San Jose police. On April 5, 1995, Officer Gordon Bowen contacted Brayevich who introduced Miller, who was visiting him, as Selena Bay. Bowen set up surveillance around Brayevich's house and observed Miller leave the residence, walk around the corner and get into a car, which drove off. It appeared that she had arranged for someone to pick her up.

On August 16, 1995, Bowen and his partner contacted Brayevich and Miller as she drove Brayevich's car into his driveway. Brayevich was upset and walked to the side of the house. Miller identified herself to Bowen as "Selena Brayevich" and said she had no driver's license. She became angry and aggressive when Bowen said he knew her name was not Brayevich. She eventually identified herself to officers as Gina Miller and was fingerprinted and photographed.

On August 24, 1995, Bowen and Officer Peter Scanlan contacted Brayevich and informed him of Miller's identity and the existence of her two small children. Brayevich told Scanlan that Miller said she was a virgin. He did not understand "how could a young lady be so deceitful." Scanlan said Brayevich seemed both "sad" and "somewhat relieved" that he knew the truth about Miller and Harris. Brayevich immediately stopped spending money on them.

In September 1995, Brayevich received several telephone calls from defendants. Scanlan provided him with a tape recorder and he taped a number of the calls. Harris wanted to know if Brayevich was going to "press charges" and asked him to lie to the police because he had enough problems. Miller called Brayevich and asked him "to forget the whole thing." She told him she loved him and cared for him, and that he "gotta stop those cops honey." Eventually, she wound up saying "if I go to jail, I'm gonna kill you! I swear! I don't want to go to jail honey. I don't want to."

*Wilbur Johnston, Count 5*

Eighty-two-year-old Wilbur Johnston was a retired accountant who lived on a fixed income and who was very careful with his money. Two months before Wilbur died in November 1995, his son, Dave, who was accustomed to spending a lot of time with his father, moved in; Dave lived with him until his death.

Afterward, Dave found various charge receipts among Wilbur's papers for the purchase of items which Wilbur would not have used himself. These included the purchase of a cellular telephone, accessories, and service even though Dave had never seen Wilbur with a cellular telephone. There were charges from Bare Essentials amounting to $271.73, and charges of women's and children's clothing from Mervyn's ($483.77) and the Emporium.

On July 15, 1995, a few months before his death, Wilbur used his Visa account to charge furniture costing $886.99 at the Bedroom Store. The sales receipt showed it was delivered to defendants' Sunnyvale Avenue address and it was found in Harris's house by the police when it was searched the following August. Receipts for items purchased on Wilbur's charge accounts were also found in defendants' residence. Cellular telephone charges on Wilbur's credit card accounts corresponded to numbers used by defendants and not Wilbur. Wilbur never mentioned defendants to Dave.

On an earlier occasion, on June 12, 1995, Wilbur, accompanied by Harris who was using the name "Michael Marcos," came into the Circuit City store

on Stevens Creek and bought the cellular telephone. Wilbur signed the credit card charge slip for the $221.53 initial purchase and identified himself with a Social Security card and a driver's license. On June 28, 1995, Michael Marcos traded in the analog telephone for a store credit and bought a digital telephone which cost an additional $113. A second trade-in for a more expensive model costing an additional $89 took place on August 16, 1995. Michael Marcos also added a performance guarantee and a cigarette lighter adapter. The clerk allowed Michael Marcos to obtain a store credit for the initial purchase because Marcos was with Wilbur Johnston when the initial transaction occurred. The subsequent purchase was made partially with funds charged to Wilbur's account.

*Evidence of Common Scheme or Plan*

### 1. Jack McCallister

Around October 1995, 78-year-old Jack McCallister was walking in a Safeway store parking lot in Campbell when two young women came up behind him and started a conversation. One called him "Fred" and told him she thought he was someone she knew. She introduced the other woman and then asked McCallister for his telephone number or address so she could take him out to dinner. He made an appointment with her.

However, he told his daughter, Jill Genestra, about the incident. She was out of sight in the kitchen when the two women showed up at McCallister's home. After asking if he was alone, both women appeared surprised and tense when he said his daughter was there and she walked into the room. The women refused to give their names and show identification. After more questioning by Genestra, McCallister's two sons-in-law arrived and Genestra asked the women to leave. They drove away in an older model white Cadillac. Several months later, Genestra saw a newspaper article with a photograph of a woman resembling one of the two persons who invited her father to dinner. McCallister recognized the photograph in the newspaper as resembling the woman who approached him in the parking lot but neither he nor Genestra could identify Miller in court.

### 2. Robert Dodd

In the summer of 1995, 79-year-old Robert Dodd met a woman who identified herself as "Savanna," as he was dining alone in a Lyon's restaurant in Sunnyvale. She convinced him she was alone and without money or any place to stay with her two children, Eric and Moses.

Dodd allowed her to spend a night or two at his house (they slept in the same bed but there was no sex) and then booked them in at a motel. Dodd

paid for Eric and Moses to visit the dentist and took Savanna shopping to purchase clothing for them. He paid for the motel bills, telephone calls, nanny services, and some jewelry, but only "nickel or dime stuff." In the four to six months he knew Savanna, he spent about $5,000 on her. He had to mortgage one of his homes to pay the expenses he incurred on her behalf. He had intended to sell that house in any event. He last saw her in the beginning of October 1995, two weeks before he was interviewed by Officer Scanlan. He never saw her again. He could not identify Miller in court.

### 3. *Ned Wyss*

In January 1994, Miller approached 89-year-old retired widower Ned Wyss in a Lucky grocery store in Cathedral City near Palm Springs. She identified herself as "Selena" and said she wanted to get to know him. She had a young child named Moses with her. Wyss ignored her. As he walked away, she said, "come on, be nice. Can you give me your name and phone number . . . ."

Wyss obliged. He talked to her for about 15 minutes and gave her his phone number. She called him the next day and asked him to buy food for her children. She met him at the Lucky store where he purchased groceries for her. She then told him she lived with an uncle who wanted her to move out. Wyss verified this by telephoning the uncle at a number Miller gave him, then they drove to an apartment complex where they met Harris whom Miller introduced as the apartment manager and her friend.

Harris told Wyss it would cost $900 for Miller to rent an apartment. Wyss produced the money the next day.

Miller invited Wyss to dinner at Harris's apartment in the same complex as the apartment she leased and introduced him to a woman who was supposed to be Harris's wife. Harris and Miller "had the run of [Wyss's] house," and they became "pretty good friends" with him. Miller and Harris often spoke to each other in a foreign language and Miller told Wyss she spoke Russian. Miller eventually identified herself as "Selena McGill." McGill was the surname of Harris's father, which Harris occasionally used.

Miller "was always trying to be amorous" with Wyss, including trying to kiss him. However, he rebuffed her. On one occasion after taking a shower, she emerged from his bathroom wrapped in a towel. She stood in front of him and dropped it. He told her to "get going." Miller said she wanted to marry him and asked him to buy her an engagement ring. Wyss laughed and absolutely refused, but nevertheless, Miller introduced him as her fiancé.

Harris asked to borrow a credit card for gasoline and then "disappear[d]" for two or three weeks while he ran up a "tremendous" number of charges. Harris asked Wyss to cosign a credit card application so Harris could establish his own credit history. Wyss did so and Harris charged between $20,000 and $30,000 on the account. Harris also charged a $14,000 Rolex watch to Wyss's account without authorization.

Before Wyss met defendants he never kept a credit card balance and he had no outstanding debts. He owned a trailer home in Cathedral City and a condominium in Los Angeles, which he purchased with cash. When Wyss received the bills for purchases signed by Harris and confronted him about the charges, Harris suggested Wyss get a loan on his condominium to pay the charges. Defendants also promised to pay the charges but never did so. When Wyss said he was going to call the police, Miller told him he should not do so. After that, they disappeared. Wyss eventually mortgaged his condominium to pay the bills. However, as the charges mounted, he was forced to file for bankruptcy and lost his condominium.

### Harris's Escape

On February 16, 1996, Harris was an inmate in a Santa Clara County jail dormitory with Jamie Owen, who was due to be released that evening, and Dana Mulvani. Mulvani pointed out that Owen and Harris bore a strong resemblance to each other. Harris offered Owen $5,000 to switch identities with him so that Harris would be released instead of Owen. Owen expressed reservations about the idea, but Harris both cajoled and threatened him, saying that he knew where Owen's family lived.

The two men exchanged wrist bands, and Owen provided Harris with the personal information he would need to pass through the jail release procedure. Harris was fingerprinted and then released around 12:40 a.m. Three or four hours later, Owen contacted jail guards saying he had slept through his release call. Harris was rearrested around June 6, 1996, in the Beverly Hills area.

### The Trial

Jury trial began on March 18, 1997, on an information charging Miller and Harris with grand theft by false pretenses from Brayevich in count 1 (Pen. Code, §§ 484, subd. (a), 487, subd. (a)) with the allegation of a great taking of more than $150,000 in value (Pen. Code, § 12022.6, subd. (b)).[1] In counts 2 and 3, Harris and Miller respectively were charged with attempting to

---

[1]Further statutory references are to the Penal Code unless otherwise noted.

dissuade a witness in furtherance of a conspiracy. (§ 136.1, subd. (c)(2).) In count 4, Miller was charged with dissuading or attempting to dissuade a witness by the use of force or a threat of force. (§ 136.1, subd. (c)(1).) In count 5, Miller and Harris were charged with grand theft by false pretenses from Wilbur Johnston. (§§ 484, subd. (a), 487, subd. (a).) In count 6, Harris was charged with access card forgery. (§ 484f, subd. (b).) In count 7, Harris was charged with escape from a jail. (§ 4532, subd. (b)(1).) The information also alleged that Harris had previously suffered four prior felony convictions qualifying as strikes under the three strikes laws. (§§ 667, subds. (b)-(i), 1170.12.) Trial of the prior convictions was bifurcated.

With the exception of count 5, which the trial court dismissed as to Miller (§ 1118.1), the jury found true all counts and the great taking allegation, and the trial court found true all allegations of prior felony convictions.

The trial court sentenced Harris to 77 years to life (three 25-year-to-life sentences to be served consecutively plus the two-year great taking enhancement, one 25-year-to-life sentence to be served concurrently, and one 25-year-to-life sentence stayed).

Miller received seven years in state prison: the two-year midterm for count 1 plus the consecutive two-year great taking enhancement; three years concurrent on dissuading a witness, count 3; and three years consecutive for dissuading a witness with a threat of force, count 4. This appeal by both defendants ensued.

## ISSUES ON APPEAL

As to count 1, Harris contends that there is insufficient evidence of corroboration of a false pretense, and that the court failed to instruct on both the necessity for corroborative evidence of the false pretense and the sufficiency of the evidence corroborating a false pretense. Miller asserts that the trial court should have granted her motion for acquittal (§ 1118.1) on count 1 because her misrepresentations did not materially induce Brayevich to give her money or property. She also contends that insufficient evidence supported the great taking enhancement and that the court should have instructed sua sponte on the lesser included offense of attempted grand theft by false pretenses.

Harris claims the evidence was insufficient to support his conviction of access card forgery and theft from Wilbur Johnston and challenges the admissibility of the evidence of the uncharged incidents involving Wyss, Dodd, and McCallister. Harris also claims that there was insufficient evidence that he attempted to dissuade a witness or victim in furtherance of a

conspiracy. Both he and Miller complain that the instructions were confusing, conflicting, and erroneous. Both defendants assert that the trial court erred in failing to instruct on the element of "attempt" in counts 3 and 4, dissuading a witness, and that the court should have instructed on the lesser included offense of misdemeanor dissuading a witness or victim.

Harris declares there was insufficient evidence to support his conviction of escape, that the hearsay statements of inmate Jamie Owen were inadmissible, and that the court failed to instruct on accomplice testimony as to the escape charge. Miller closes with the assertion that remand is required for discovery and further hearing on a motion to dismiss due to invidious prosecution.

### SUFFICIENCY OF THE EVIDENCE OF FALSE PRETENSE

#### 1. *Scope of Review*

"In reviewing the sufficiency of the evidence, we must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (*People v. Davis* (1995) 10 Cal.4th 463, 509 [41 Cal.Rptr.2d 826, 896 P.2d 119], italics in original.) " 'In making this determination, the reviewing court must consider the evidence in a light most favorable to the judgment and presume the existence of every fact the trier could reasonably deduce from the evidence in support of the judgment. The test is whether substantial evidence supports the [conclusion of the trier of fact], not whether the evidence proves guilt beyond a reasonable doubt.' [Citation.]" (*People v. Crittenden* (1994) 9 Cal.4th 83, 139 [36 Cal.Rptr.2d 474, 885 P.2d 887].)

#### 2. *Sufficiency of the Corroboration of the False Pretense*

First, Harris complains that there is insufficient evidence to support his conviction as to the Brayevich taking "since there is no competent evidence corroborating Brayevich's testimony concerning the oral false pretenses made by codefendant."

"A theft conviction on the theory of false pretenses requires proof that (1) the defendant made a false pretense or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the property to the defendant in reliance on the representation. [Citations.] In this context, reliance means that the false representation 'materially influenced' the owner's decision to part with his

property; it need not be the sole factor motivating the transfer. [Citation.] A victim does not rely on a false representation if 'there is no causal connection shown between the [representations] alleged to be false' and the transfer of property. [Citations.] Thus, if the defendant makes both true and false statements to the owner, but the false statements are irrelevant to the owner's decision to transfer the property, theft on the theory of false pretense has not been committed. [Citation.] Reliance may be inferred from all the circumstances. [Citation.]" (*People v. Wooten* (1996) 44 Cal.App.4th 1834, 1842-1843 [52 Cal.Rptr.2d 765].)

 "If, as here, the conviction rests primarily on the testimony of a single witness [(Brayevich)] that the false pretense was made, the making of the pretense must be corroborated. [Citations.] The corroboration required by section 1110 is of the making of the pretense. [Citations.] The circumstances connected with the transaction, the entire conduct of the defendant, and his declarations to other persons may be looked to for the corroborative evidence contemplated by the law. [Citations.]" (*People v. Randono* (1973) 32 Cal.App.3d 164, 173 [108 Cal.Rptr. 326].) As is relevant in this case, the defendant cannot be convicted "unless the pretense is proven by the testimony of two witnesses, or that of one witness and corroborating circumstances. . . ." (§ 532, subd. (b).)

 In the instant case, the evidence was more than sufficient to support defendants' convictions on the count of theft by false pretenses from Nicholas Brayevich.

The first element, the false pretense made to the owner of the property, consisted of Miller's statements and actions conveying that she was single, a virgin, and lived alone. "The false pretense may consist in any act, word, symbol, or token calculated and intended to deceive. It may be either express or implied from words or conduct. [Citations.]" (*People v. Randono, supra*, 32 Cal.App.3d at p. 174.)

Harris states it is his position "that as to the false pretenses in question (i.e., single and no children), there is no evidence in the record as to those pretenses other than Brayevich's own testimony and statements."

We disagree. Brayevich was not the only witness who testified to Miller's initial statements to vulnerable elderly, lonely men. Wyss, Dodd, and McCallister testified that Miller approached them, each a stranger to her, gave a false name, claimed that she was alone without means to support herself, and asked for help: food, money to rent an apartment or to pay for dental visits for her children, or for clothing, etc. Although there were certain variations

(Brayevich was told she was a virgin, so by implication, she had no children, and she lied about her relationship with Harris; Dodd and Wyss were introduced to her children; Dodd and McCallister were told Harris was her husband; and she lied about her relationship with Harris to Wyss), Miller tried the same scheme with the same basic representations to the same class of victims.

■ Corroborative evidence may be found in the defendant's declarations to other persons. (*People v. Fujita* (1974) 43 Cal.App.3d 454, 470 [117 Cal.Rptr. 757].) "The multiple witnesses required under Penal Code section 532, subdivision (b), need not testify to the same instance of pretense. When more than one witness testifies to a defendant's false pretenses, even though made on separate occasions, the multiple witness requirement is met as long as the same type of scheme is involved and the same manner is employed. [Citations.]" (*People v. Gentry* (1991) 234 Cal.App.3d 131, 139 [285 Cal.Rptr. 591].)

This evidence was sufficient to establish corroboration of the false pretense. "Corroborating evidence is sufficient if it tends to connect the defendant with the commission of a crime in such a way so as to reasonably satisfy the jury that the complaining witness is telling the truth; the corroboration is inadequate if it requires aid from the testimony of the witness to be corroborated in order to connect the defendant with the alleged offense. [Citations.]" (*People v. Fujita, supra*, 43 Cal.App.3d at p. 470, fn. omitted.) "Since the corroborative evidence need only tend to implicate the defendant in the alleged illegal activity, it may be slight and entitled to little weight standing alone. [Citations.]" (*Ibid.*) ■ Here, the evidence of Miller's conduct in inducing other elderly men to give her and Harris money and items of value reasonably satisfied the jury of the truth of Brayevich's testimony. Substantial evidence supports Harris's conviction.

### 3. *The Adequacy of the Instructions*

■ Harris also claims for the first time in this court that the trial court's instruction that a false pretense must be proved by the testimony of two witnesses or that of one witness and corroborating circumstances did not adequately inform the jury how to determine whether the corroborating evidence was sufficient. He asserts the jury should have been given an instruction patterned on the CALJIC accomplice testimony instruction. (CALJIC No. 3.12.) The instruction he suggests in his brief tells the jury first to assume the witness's testimony was removed from the case as to the false pretense and then to determine whether there was any remaining evidence which tended to establish the existence of the false pretense. If there was none, the testimony of the single witness was not corroborated.

The trial court instructed with CALJIC No. 14.14 as follows: "The defendant cannot be convicted of theft by false pretenses unless: [¶] . . . [¶] 2. An oral false pretense is accompanied by a false token or writing, or [¶] 3. The false pretense that is proved by the testimony of two witnesses or that of one witness and corroborating circumstances. [¶] If the evidence shows that the defendant made similar false representations or pretenses to a person other than the owner, the evidence, if believed by you, is sufficient corroboration."

" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]" (*People v. Guiuan* (1998) 18 Cal.4th 558, 570 [76 Cal.Rptr.2d 239, 957 P.2d 928].) Defendant did not so request. The claim is waived on appeal. The jury was adequately instructed on its burden in the language of the statute. There was no error.

#### 4. *Reliance on the Representations*

Miller also attacks the sufficiency of the evidence in her claim that she should have been acquitted on the Brayevich taking because "the misrepresentations did not materially induce Brayevich to give [her] money or property."

Miller relies on Brayevich's testimony that her giving a false name, claiming to be alone in the area, and claiming to be a virgin did not make a difference to Brayevich's continuing to give money when he found out that Miller's statements were false. She also asserts that "[w]hether or not she had children did not come up."

However, Miller concedes that Brayevich testified it did make a difference when he found out she was living with Harris and had two children. If he had known of the two children when he met her, he would have wanted no further relationship.

In response to this, Miller stresses the fact that "Gina was in fact not married. California does not recognize common law cohabitation and the prosecution produced no evidence of marriage. Thus, the only false representation, if at all, was that Gina had no children. However, the prosecution established no causal connection and material reliance between that false representation, if proven, and Brayevich's parting with his money. Where, as here, he parted with his money for another reason to maintain a sexual, affectionate relationship with Gina, the causal connection and material reliance on the false representation were not established."

This is a disingenuous argument. Miller's statements that she was a virgin and alone were intended to induce Brayevich to part with money by negating the idea, repugnant to Brayevich, that she had ever been in a sexual relationship, much less a current cohabitation. If she had never been in a sexual relationship, naturally the subject of children would "not come up."

"It is unnecessary to prove all of the false representations claimed, provided that enough are proven to convince the jury that those shown were material in inducing the complainant to part with his money. [Citations.] Where two false representations are made, the jury is not compelled to find that either was the sole inducing cause. [Citation.]" (*People v. Fisher* (1931) 116 Cal.App. 243, 245-246 [2 P.2d 564].)

We look at the totality of the evidence of Miller's conduct with Brayevich. "Reliance may be inferred from all the circumstances. [Citation.]" (*People v. Randono, supra*, 32 Cal.App.3d at p. 174.) " ' " [T]he express testimony of a victim of false pretense that he was induced to part with his money by the fraudulent statements of the accused is not essential.' " ' " (*People v. Keefer* (1973) 35 Cal.App.3d 156, 164 [110 Cal.Rptr. 597].) In this case, Brayevich testified that certain of Miller's lies did not matter to him and others did. The jury was entitled to believe this evidence of reliance. Substantial evidence supports Miller's conviction.

5.-6.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

ACCESS CARD FORGERY*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

GRAND THEFT FROM JOHNSTON

Next, Harris contends there is a total lack of evidence to support his conviction for a theft from Wilbur Johnston. He maintains, mistakenly, as we shall explain, that the evidence of Wilbur Johnston's receipts and charge account statements was not admitted for the truth of the contents, and that there was no showing that there was "the actual payment of money by Wilbur Johnston for the amounts and items reflected in that paperwork." He also claims that there was no evidence that Harris committed theft by taking and carrying away Johnston's property without his consent, which was the only type of theft on which the jury was instructed. Finally, he states there

---

*See footnote, *ante*, page 1427.

was no evidence to show Harris made false promises or representations to Johnston to cause him to pay for the items in issue.

When Johnston, a frugal 82-year-old man who lived on a fixed income in a mobilehome, died in November 1995, his son Dave found various charge account receipts among his papers showing thousands of dollars worth of items charged to Wilbur Johnston's accounts for things he would not use himself, such as a cellular telephone and service when he had no cellular telephone among his effects; women's and children's clothing; lotions, soaps, and breast creams; and $886.99 in furniture that was delivered to Harris's address at 537 Sunnyvale Avenue and found there when the search warrant was executed. As discussed in regard to the charge of access card forgery, the cellular telephone was exchanged by "Michael Marco" for a more expensive model and the cellular telephone charges on Johnston's credit card accounts corresponded to numbers used by appellants and not Johnston.

Harris's hearsay objection to Dave Johnston's testimony of finding his father's records and turning them over to the police was overruled. Dave Johnston identified his father's handwriting when applicable, for example, Wilbur Johnston's signature on charge receipts, and additional papers with handwritten notations, including the names "Salina" and "Jina," both of which were used by codefendant Miller. (Evid. Code, § 1416.) The record shows that the documents were admitted into evidence without further objection or limitation on their use.

Authentication of a writing is required before it may be received into evidence and before secondary evidence of its content may be received into evidence. (Evid. Code, § 1401.) "Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." (Evid. Code, § 1400.) In the instant case, Johnston's son's properly admitted testimony established that the documents were charge account records kept by Johnston, which showed his purchases. Of these purchases, the bedroom furniture was found in Harris's possession. Other items (women's and children's clothing and toiletries) were of the sort that neither Johnston nor Harris would have used, but which Miller and her children would have. Appellant does not claim that after his initial, overruled, hearsay objection he objected that there was insufficient foundation to admit the documents for proof of their contents. Consequently, the writings were properly admitted. (Evid. Code, § 1520 et seq.)

■ "Theft, of which [appellant] was convicted, is the unlawful taking of another's property. (§ 484; [citation].) The crime includes larceny, embezzlement, larceny by trick, and theft by false pretenses. [Citations, fn.

omitted.] Larceny, larceny by trick, and embezzlement involve taking another's personal property from the owner's possession, without the owner's consent, with the intent to deprive the owner permanently of the property. [Citations.] Theft by false pretenses does not require that the defendant take the property; it requires that the defendant use false pretenses to induce the other to give the property to him. [Citation.]" (*People v. Shannon* (1998) 66 Cal.App.4th 649, 653-654 [78 Cal.Rptr.2d 177].)

"As the jury was instructed, theft requires the specific intent to permanently deprive the owner of its property. [Citations.] . . . '[T]heft may be committed when the accused persons, with a preconceived design to obtain and appropriate property by means of fraud or trickery, thereby gain possession of the property, even though they do not retain or use it for their own benefit. [Citation.]' [Citation.]" (*People v. Shannon, supra*, 66 Cal.App.4th at p. 656.)

"In California, the ancient common law distinctions between the theories of larceny by trick and theft by false pretenses no longer exist by statute; under section 484, there is simply one consolidated crime of theft, which the jury may find upon either theory, if there is an 'unlawful [taking]' (§ 952). As stated by our Supreme Court in *People* v. *Ashley* (1954) 42 Cal.2d 246, 258 [267 P.2d 271], 'The purpose of the consolidation was to remove the technicalities that existed in the pleading and proof of these crimes at common law. . . . Juries need no longer be concerned with the technical differences between the several types of theft, and can return a general verdict of guilty if they find that an "unlawful taking" has been proved. [Citations.]' We note that another recent larceny case . . . supports our analysis: 'In the instant action it was irrelevant whether defendant obtained the dress by trick or intimidation of the store employees. The end result was that he left the store with property he had not paid for.' [Citation.]" (*People v. Counts* (1995) 31 Cal.App.4th 785, 793 [37 Cal.Rptr.2d 425].)

 In our case, there is substantial, albeit circumstantial, evidence to establish appellant's intent to commit theft from Johnston as established by his involvement in the conspiracy with Gina Miller to defraud Brayevich and others. (Evid. Code, § 1101, subd. (b).) "Both direct and circumstantial evidence are acceptable as means of proof. Neither is entitled to any greater weight than the other." (CALJIC No. 2.00.) There is no reasonable explanation for how appellant came to acquire thousands of dollars of property charged to Johnston's account, absent fraud. (Cf. *People v. Silberman* (1989) 212 Cal.App.3d 1099, 1116-1117 [261 Cal.Rptr. 45].) Johnston was living in retirement on a fixed income and was necessarily frugal. There is no evidence that Johnston owed a debt to appellant; appellant was not a relative

or known to be a friend (whether as "Marco," "Harris," or any other name) who would be the normal object of Johnston's bounty. The only reasonable explanation for Johnston's unusual expenditures was that he was another victim of Harris's and Miller's common scheme or plan to defraud vulnerable old men. Substantial evidence supports the conviction.

## EVIDENCE OF UNCHARGED INCIDENTS

 Next, Harris asserts that the trial court should have excluded evidence of the incidents involving Wyss, Dodd, and McAllister. Harris claims that the trial court did not consider "whether the evidence . . . related to such typical issues as identity, intent or absence of a mistake. Nor did there appear to be any discussion or consideration under section 352 of the Evidence Code as to whether the prejudicial impact of the evidence . . . outweighed its actual probative value."

Harris makes the surprising claim that "it is quite clear that the material issue in actual dispute was *not* an intent on the part of either [Harris] or [Miller]. They intentionally took what the victim gave them. The real issue in dispute was the intent of the victim as to whether the victim actually and openly consented to the use of his money by [Harris] and [Miller] in spite of any alleged pretenses made by [Miller]. It was only the victim's intent and reliance that was in issue."

Harris cites *People v. Bruce* (1989) 208 Cal.App.3d 1099 [256 Cal.Rptr. 647] as authority that evidence of uncharged incidents was inadmissible in this case because the evidence had no tendency to prove or disprove Brayevich's consent or reliance. In *Bruce*, evidence of a prior rape was declared to be inadmissible because it was irrelevant to the ultimate fact of consent or lack of it by the current rape victim.

Evidence of a prior crime or bad act is admissible so long as it shows not only criminal disposition, but is relevant to prove a fact such as motive, opportunity, intent, plan, or knowledge. (Evid. Code, § 1101, subd. (b); *People v. Gordon* (1990) 50 Cal.3d 1223, 1240 [270 Cal.Rptr. 451, 792 P.2d 251].) " '[A]s with other types of circumstantial evidence, . . . admissibility [of other crimes evidence] depends upon three principal factors: (1) the *materiality* of the fact sought to be proved or disproved; (2) the *tendency* of the uncharged crime to prove or disprove the material fact; and (3) the existence of any *rule* or *policy* requiring the exclusion of relevant evidence.' [Citation.]" (*People v. Robbins* (1988) 45 Cal.3d 867, 879 [248 Cal.Rptr. 172, 755 P.2d 355].)

 In the instant case, whether defendants harbored the requisite intent to defraud Brayevich was a disputed material issue. Other crimes evidence is

admissible " 'where the proof of defendant's intent is ambiguous, as when he admits the acts and denies the necessary intent because of mistake or accident.' " (*People v. Robbins, supra,* 45 Cal.3d at p. 879.) Harris admits "intentionally [taking] what the victim gave them" but denies the criminal intent.

The Wyss, Dodd, and McCallister incidents had a strong tendency to prove that defendants had the disputed intent. " '[I]f a person acts similarly in similar situations, he probably harbors the same intent in each instance' [citations], and . . . such prior conduct may be relevant circumstantial evidence of the actor's most recent intent. The inference to be drawn is not that the actor is *disposed* to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution. [Citations.]" (*People v. Robbins, supra,* 45 Cal.3d at p. 879.) Furthermore, as discussed *ante,* the other crimes evidence also corroborates Brayevich's testimony regarding the false pretenses.

Harris contends that it was error to admit evidence of the incidents involving Dodd and McAllister because Harris "was in custody at the time of those incidents and was in no way participating in those matters."

The modus operandi of the criminal scheme in which both defendants participated was that Miller would cast her lures into the victims' water and hook the victims when they bit. Harris would come along later and help gut and bleed them. Whether Harris was temporarily unable to personally bleed and gut Dodd and McAllister is irrelevant to the admissibility of the evidence. Each incident reveals common characteristics shared by the schemes against all the victims and establishes their frequency and success. " '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 [27 Cal.Rptr.2d 646, 867 P.2d 757], quoting 2 Wigmore, Evidence (Chadbourn rev. ed. 1979) § 302, p. 241.)

The victims (Brayevich, Dodd, Wyss, and McCallister) shared similar characteristics: they were elderly men who appeared vulnerable and were accessible (eating alone in a restaurant, shopping alone in a supermarket, gardening alone in the front yard) with no visible relatives, friends, or natural protectors. Miller's approach to each man followed a similar pattern. She appealed to their desire for human contact (on the first meeting she

asked Wyss for his name and phone number; she told McCallister she wanted to take him out to dinner; and she asked for and received Dodd's address), and then she appealed to their charity and sympathy (her son needed food; she had no place to stay because her uncle had told her to leave their home; and her son needed to see a dentist and was hungry and needed clothes). There was no error in admitting this evidence.

Finally, Harris complains that the trial court abused its discretion under Evidence Code section 352 by failing to exclude this evidence as more prejudicial than probative.

We disagree. " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " (*People v. Karis* (1988) 46 Cal.3d 612, 638 [250 Cal.Rptr. 659, 758 P.2d 1189].) Here the evidence was relevant and probative on the issues of defendants' criminal intent and to corroborate the victim's testimony. The court could properly conclude that the potential for prejudice was outweighed by the probative value of the evidence. There was no error.

### DISSUADING A WITNESS OR VICTIM*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

### ESCAPE*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

### OWEN'S STATEMENTS*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

### ACCOMPLICE TESTIMONY INSTRUCTIONS*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

### MOTION CLAIMING INVIDIOUS PROSECUTION*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 1427.

## DISPOSITION

The judgment as to each defendant is affirmed.

Cottle, P. J., and Elia, J., concurred.

A petition for a rehearing was denied July 6, 2000, and the opinion was modified to read as printed above. The petitions of all appellants for review by the Supreme Court were denied September 20, 2000.