Filed 4/17/13  P. v. Coffman CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.111.5.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE, | 2d Crim. No. B239789 |
| Plaintiff and Respondent, | (Super. Ct. No. 2009040732) |
| | (Ventura County) |
| v. | |
| DANIEL COFFMAN, | |
| Defendant and Appellant. | |

Daniel Coffman appeals his conviction by jury of three counts of grand theft by false pretenses in which he took cash and used the victim's credit card to make unauthorized purchases. (Pen Code, § 487.)[1]  Appellant admitted a prior prison term enhancement (§ 667.5, subd. (b)), was sentenced to five years four months in county jail  (§ 1170, subd. (h)(5)), and ordered to pay $56,052 restitution.  We affirm.

*Facts*

In June 2008, appellant asked Tracy Clark to loan him money to get his health care business and assets back from his wife.  Appellant said that his wife (Judy Fercioni) had left him and "froze all his money, his bank accounts, [and] everything he had . . . ."   None of it was true.  Appellant was single, had no savings or assets, and as a term of parole, was prohibited from operating a health care business.  Based on appellant's assurances that he was wealthy and would pay her back in 30 days, Clark

---

[1] All statutory references are to the Penal Code unless otherwise stated.

took out cash advances on her credit card and gave appellant $15,000. Clark later discovered that appellant used her credit card without her permission to purchase a laptop and microscope and took cash advances.

Clark first met appellant in March 2008 at the lavish office of Nu Science International. Appellant had a lab coat and doctorate certificates on the wall. He pricked Clark's finger, took a drop of blood, and projected the blood on a large computer monitor. Appellant said that her blood "was very toxic" and the "cells didn't move around like they're supposed to . . . ." Appellant told Clark that an "alkalarian lifestyle" and raw food diet would "clean" her blood and heal "anything wrong with you."

Appellant billed Clark $645 and said he would waive the fee if she referred clients. Appellant bragged that he customarily made $645 an hour, owned a million dollar house and a time share in Cabo San Lucas,  and bought a $260,000 six-carat wedding ring for his young wife, Judy Fercioni. After Clark visited Nu Science, appellant called regularly and told her "beautiful stories," sang opera to Clark, and cried about his mother passing. Appellant said that his first wife left him, took millions of dollars and his house, and left him with nothing. Appellant told Clark that he came out to California and earned everything back by selling millions of bottles of liquid vitamins and his own oxygen inhaler.

Appellant lived with Fercioni who set up Nu Science for him, paid the office expenses and appellant's living expenses. Fercioni broke off the relationship after she found a message on the office computer stating that appellant was looking for a gay sugar daddy "who can take care of me financially and sexually."

Appellant called Clark on June 6, 2008 (Clark's birthday), crying about how Fercioni left him and "froze" all his money and assets. Appellant was hysterical and said he was about to take "skull cap" pills to end his life. Clark offered to help, cared for his dogs, and let appellant move in . . . . Appellant asked for money to get his assets "unfrozen" and get his art work patented so Fercioni did not steal it.

2

Appellant said he had $3 million buried in Mexico and would pay Clark back in 30 days.

In September 2008, appellant said that he lost everything and that Fercioni got it all. Clark told appellant to move out. In November 2008, Clark spoke to Fercioni and learned that appellant was on parole and owed Claudette Siah more than $80,000 restitution. Clark threatened to ask the parole officer for help. Appellant begged Clark not to go to his parole officer and gave Clark a $50,059 promissory note for everything he owed.

Over defense objection, evidence was received that appellant defrauded three other single women.

*Claudette Siah*

Claudette Siah, a secretary at an insurance company, was laid off in 2000 and received a $47,647 retirement savings check that had to be reinvested in 60 days. Siah met appellant at a BioLink seminar where appellant was selling a health drink. Appellant said that he was a lawyer, knew about stocks, and would help Siah reinvest the money. Appellant deposited the retirement savings check in his BioLink account and spent the money on himself. In September 2001, he told Siah all the money was lost in the World Trade Center terrorist attack. Appellant was convicted of grand theft and ordered to pay $87,247 restitution but never paid Siah anything.[2]

*Michele Inouye*

Michele Inouye, a divorcee and real estate agent, met appellant in 2002 at a self-awareness seminar. Appellant claimed that an ex-wife financially destroyed him and that he was homeless and living in his car. After Inouye let him move into her Northridge house, appellant said he wanted to start a business and needed a nicer car. Inouye bought him a Jeep Grand Cherokee for about $7,000 or $8,000. Appellant said that he needed a microscope to start up the business and would pay her back after his mother died and he inherited her house. Inouye paid for appellant's gas

---

[2] We affirmed the conviction in an unpublished opinion. (B186332.)

3

and clothes and bought him a $4,000 microscope and computer, but was never paid back,

### Judy Fercioni

In June 2005, Judy Fercioni was getting a divorce and had a mother who was dying.  Appellant said that he was a naturopathic doctor, had the cure for cancer, and could cure Fercioni's mother.  Appellant told Fercioni that he owned a molecular biology business and a lighting company,  a house in Northridge with an expensive art collection, a Manhattan Beach estate worth $2.8 million, and a timeshare in Cabo San Lucas.

In December 2006, appellant moved into Fercioni's house and used her Lincoln Navigator to promote his health care business.   Fercioni set up Nu Science International for appellant, furnished the office, paid the office lease, and bought appellant a $4,000 microscope.  Appellant had Fercioni buy a $55,000 six carat engagement ring and promised to pay her back.  After Fercioni found the sugar daddy message on the office computer, she broke off the relationship.  Fercioni testified that appellant had no assets, that she was not married to appellant, and did not "freeze" any of appellant's assets.

### Grand Theft By False Pretense

The jury was instructed that in order to convict for grand theft by false pretenses, the prosecution had to prove that (1) appellant made a false pretense or representation to Clark, (2) with the intent to persuade Clark to let appellant take possession and ownership of her  property, and (3) that Clark, in reliance on the false pretense or representation, let appellant take possession and ownership of her property. (§ 487; CALCRIM 1804.)  Consistent with section 532, subdivision (b), the trial court instructed that a false pretense must be accompanied by a false writing, by a note or memorandum signed by the appellant, or by testimony "from a single witness along with other evidence [which] supports the conclusion that the defendant made the pretense.  To establish corroboration by multiple witnesses, the witnesses do not have

4

to testify to the same false pretense.  The requirement is satisfied as long as they testify to the same scheme or type of false pretense." (CALCRIM 1804.)

*Prior Bad Acts*

Appellant argues that the trial court erred in admitting prior bad acts concerning Siah, Inouye and Fercioni.  Although prior bad acts are inadmissible to prove criminal disposition, they may be admitted to prove a disputed material fact such as intent, motive, knowledge, common plan or scheme, identity, or the absence of mistake or accident.  (Evid. Code, § 1101, subd. (b): *People v. Ewoldt* (1994) 7 Cal.4th 380, 402-403.)  The trial court also determines whether the probative value of the evidence outweighs the probability that its admission will a create a substantial danger of undue prejudice, confuse the issues, or mislead the jury.  (Evid. Code, § 352; *People v. Ewoldt, supra,* 7 Cal.4th at p. 404.)

The trial court here found that the prior bad acts evidence was more probative than prejudicial and would not confuse or mislead the jury.  (Evid. Code, § 352; *People v. Miller* (2000) 81 Cal.App.4th 1427, 1441.)  Appellant makes no showing that the ruling was arbitrary, whimsical, or capricious as a matter of law. (*People v. Linkenauger*  (1995) 32 Cal.App.4th 1603, 1614.)

Appellants claims that the prior bad acts are not identical but there are many similar factors.  Clark, like the other victims, was single and was told that appellant was a professional, owned a health care business, and was selling a health care product that could cure all ailments.  Six years earlier, appellant told Siah that he was president of BioLink International and that his herbal drink could cure anything Appellant made a similar pitch to Inouye and Fercioni, posing as a medical professional who needed money to buy a microscope for his business.

A "con artist" in need of a microscope is an unusual and distinct ploy. "[T]he fact that a defendant has made the same or a similar representation to another, although at a different time and place, is a corroborating circumstance.  [Citations.]  In the present case, essentially similar representations were made to each of the women.

There is not only the similarity in express representations, but in basic approach . . . ." (*People v. Ashley* (1954) 42 Cal.2d 246, 268.)

Appellant argues that the prior bad acts must be "signature-like" but that is only where the evidence is offered to prove defendant's identity as the perpetrator. (*People v. Ewoldt*, *supra,* 7 Cal.4th at p. 403.) "[E]vidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts. Unlike evidence of uncharged acts used to prove identity, the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense. [Citation.]" (*Id.*, at p. 403.) The least degree of similarity between the uncharged act and the charged offense is required to prove intent. (*Id.*, at p. 402.)

Appellant defended on the theory that he had no intent to steal and that Clark was a spurned lover who teamed up with Fercioni to get revenge and repayment. The prior bad acts were sufficiently similar to show intent, knowledge, common plan or design, and to corroborate Clark's testimony that she was conned by appellant. (§ 532, subd. (b); *People v. Miller*, *supra,* 81 Cal.App.4th at p. 1442 [multiple witnesses required under section 532, subdivision (b) need not testify to the same instance of pretense].) "Seldom will evidence of a defendant's prior criminal conduct be ruled inadmissible when it is the primary basis for establishing a crucial element of the charged offense." (*People v. Garrett* (1994) 30 Cal.App.4th 962, 967.)

*Parole Status*

Appellant contends that he was denied a fair trial because the jury received evidence about his parole and parole conditions. Parole status evidence is generally excluded as propensity evidence but may be admitted to show motive or intent or to show that the defendant committed criminal acts to evade detection or punishment for a parole violation. (*People v. Fuiava* (2012) 53 Cal.4th 622, 667-669;

see e.g., *People v. Durham* (1969) 70 Cal.2d 171, 187-189 [parole status evidence relevant to show motive to kill police officer].)

That was the case here. In the words of the trial court, "because of the cross over . . . with the Siah case and this case, . . . [appellant] locked himself into a situation where all these things became relevant." We concur. Appellant, as a condition of parole, could not possess a debit card, work in any health care business, pose as a doctor or work in a doctor's office, or own or be a partner in any health care venture. Appellant was prohibited from representing himself "beyond any validated credentials" and had to inform his parole officer "within 72 hours of any change of employment location, employer, or termination of employment." The parole conditions were properly admitted to show intent to defraud Clark, the absence of mistake, and to explain why appellant created Nu Science International as a limited liability company and listed Fercioni as sole owner and CEO.

*Harmless Error*

Assuming, arguendo, that the trial court abused its discretion in admitting the prior bad acts and parole status evidence, the error was harmless. (*People v. Earp* (1999) 20 Cal.4ht 826, 878.) The record shows that the prior bad acts and parole status evidence was no more inflammatory than the testimony concerning the charged offenses. (*People v. Ewoldt, supra,* 7 Cal.4th at p. 405.) It was stipulated that appellant had been convicted of grand theft and deceptive advertising with regard to Siah. Clark's testimony was corroborated by the Nu Science bill for the blood analysis, the Nu Science brochures and photos, the documents incorporating Nu Science as a "nutritional microscopy, scientific research & development" limited liability company, and the credit card and bank records.

The jury was instructed that appellant's parole and prior bad acts were admitted for the limited purpose of deciding whether appellant acted with the knowledge and intent to defraud Clark, to show the existence of a plan or scheme, to determine whether the alleged acts were the result of mistake or accident, and to corroborate the allegations that the defendant made the alleged false representations.

7

(CALCRIM 375.)  The jury was also instructed to "consider the similarity or lack of similarity between the uncharged offenses and/or acts and the charged offenses," and not to consider the prior bad acts and appellant's parole as propensity evidence. (CALCRIM 375.)  We presume that the jury understood and followed the instructions. (*People v. Fuiava*, *supra,* 53 Cal.4th at p. 669.)

The evidence was overwhelming.  Had the prior bad acts and parole status evidence been excluded, it is not reasonably probable that appellant would have obtained a more favorable result.  (*People v. Welch* (1999) 20 Cal.4th 701, 750; *People v. Watson* (1956) 46 Cal.2d 818, 836.)  Appellant asserts that his due process rights were violated but the application of ordinary rules of evidence do not impermissibly infringe on a criminal defendant's constitutional rights.  (*People v. Kraft* (2000) 23 Cal.4th 978, 1035; *People v. Lindberg* (2008) 45 Cal.4th 1, 26.)  Because the trial court did not abuse its discretion under state law, appellant's claim that the admission of this evidence violated his constitutional right to a fair trial is without merit.  (*People v. Fuiava*, *supra,* 53 Cal.4th at p. 670.)

*CALCRIM 220 - Reasonable Doubt*

Appellant argues that the trial erred in not modifying the CALCRIM 220 reasonable doubt instruction to say that the jury must be "persuaded to a near certainty."[3]  Our Supreme Court has consistently held that the standard reasonable double instruction is sufficient and that no further instruction defining reasonable doubt must be given.  (*People v. Aranda* (2012) 55 Cal.4th 342, 353-354; *People v.*

---

[3] Appellant requested that the trial court modify CALCRIM 220 to add the following language:   "In a criminal prosecution, evidence which merely raises a strong suspicion of a defendant's guilt is not sufficient to support a finding of guilt beyond a reasonable doubt; suspicion is not evidence, it merely raises a possibility, and this is not a sufficient basis for an inference of fact. [¶]  It is to the evidence introduced in this trial, and to it alone, that you are to look for proof beyond a reasonable doubt.  A reasonable doubt as to the guilt of the defendant may arise from the evidence, conflict in the evidence, or the lack of evidence.  To justify a criminal conviction, you must be *reasonably persuaded to a near certainty* that the defendant is guilty of the crime for which he is charged." (Italics added.)

*Freeman*  (1994) 8 Cal.4th 450, 505 [cautioning against departing from "abiding conviction" language]; *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088; *People v. Campos* (2007) 156 Cal.App.4th 1228, 1239.)

Appellant complains that trial counsel was not permitted to argue that reasonable doubt means "near certainty."  The trial court ruled that a "near certainty" argument was not a accurate statement of the law and "would be misleading and/or confusing to the jury. . . ."  We reject the argument that the ruling undermined appellant's right to effective assistance of counsel and a fair trial.  Although defense counsel has wide latitude in final argument, there is no constitutional right to misstate the law or argue points of law that confuse the jury, "stray unduly from the mark," or impede the orderly conduct of the trial.  (*Herring v. New York* (1975) 422 U.S. 853, 862 [45 L.Ed.2d 593, 600]; *People v. Marshall* (1996) 13 Cal.4th 799, 854-855.)

The jury was instructed that "[p]roof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true." (CALCRIM 220.) Appellant's assertion that "near certainty" better defines reasonable doubt is mere semantics.  (See e.g., *People v. Zepeda* (2008) 167 Cal.App.4th 25, 31.)  Defense counsel argued at length that there was reasonable doubt about whether appellant intended to defraud Clark.  Given the overwhelming evidence of guilt, it is inconceivable that the jury would have reached a more favorable result had counsel been permitted to argue that reasonable doubt means near certainty.

### *Conclusion.*

Appellant's remaining arguments have been considered and merit no further discussion.[4]  Appellant claims that the cumulative effect of the alleged errors denied him a fair trial.  As our Supreme Court has stated on several occasions, " ' " 'a defendant is entitled to a fair trial but not a perfect one.' " ' " (*People v. Marshall*

---

[4] In his opening brief, appellant claims that he was erroneously sentenced to state prison and subject to a one year prison prior enhancement.  (§ 667.5, subd. (b).) Appellant has withdrawn those issues.

9

(1990) 50 Cal.3d 907, 945.)  Our review of the record discloses that none of the purported errors, either singularly or cumulatively, denied appellant a fair trial. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1056.)

The judgment is affirmed.

NOT TO BE PUBLISHED.


YEGAN, J.

We concur:


GILBERT, P.J.


PERREN, J.

Brian J. Black, Judge

Superior Court County of Ventura

_____


Mark D. Lenenberg, under appointment by the Court of Appeal, for Defendant and Appellant.


Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Timothy M. Weiner, Deputy Attorney General, for Plaintiff and Respondent.


Gregory D. Totten, District Attorney, County of Ventura, Howard A. Wise, Senior Deputy District Attorney, Amicus Curiae, for Respondent.