Filed 1/10/14  P. v. Bradley CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> TAMAR ANTOINE BRADLEY et al., <br><br> Defendants and Appellants. | D061208 <br><br> (Super. Ct. No. SCD226810) <br><br> ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING <br><br> [NO CHANGE IN JUDGMENT] |

THE COURT:

Appellant Troy Marsalis Davis's Petition for Rehearing filed on January 7, 2013, is denied.

It is ordered that the opinion filed herein on December 18, 2013, is modified as follows:

Section V on page 19 is deleted in its entirety and replaced as follows:

V.  *Claims of Constitutional and Cumulative Error*

In view of our conclusions rejecting the claims of error, we also reject contentions that the claimed errors (1) violate federal and state constitutional rights to due process

and a fair trial (see *People v. Schmeck* (2005) 37 Cal.4th 240, 288), and (2) created a cumulative effect of error requiring reversal.

**There is no change in the judgment.**

_____

MCCONNELL, P. J.

Copies to:  All parties

Filed 12/18/13  P. v. Bradley CA 4/1  (unmodifed version)

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TAMAR ANTOINE BRADLEY et al.,<br><br>    Defendants and Appellants. | D061208<br><br><br><br>(Super. Ct. No. SCD226810) |

APPEAL from judgments of the Superior Court of San Diego County, Leo Valentine, Jr., Judge.  As to appellant Bradley, affirmed.  As to appellant Davis, affirmed as modified.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant Tamar Antoine Bradley.

Jean Matulis, under appointment by the Court of Appeal, for Defendant and Appellant Troy Marsalis Davis.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Anthony DaSilva and Susan Miller, Deputy Attorneys General, for Plaintiff and Respondent.

Tamar Antoine Bradley and Troy Marsalis Davis were convicted of various offenses arising from their participation in an insurance fraud scheme involving the purposeful causing of motor vehicle accidents.  They argue the trial court erred by failing to grant their motions to sever their trials from that of other codefendants.  Appellant Davis also asserts the trial court erred by (1) failing to sua sponte instruct the jury that it should decide whether there was a single conspiracy or multiple conspiracies; (2) instructing the jury on evidence of uncharged offenses; and (3) admitting evidence of a family relationship chart.  We reject these contentions.

Concerning sentencing issues, Davis asserts (1) the amount of a state court construction penalty exceeded the amount authorized under the statutes in existence when he committed the offenses, and (2) a booking fee was improperly imposed without a showing that he had the ability to pay it.  We reject Davis's challenge to the booking fee, but agree that the amount of his state court construction penalty exceeded the authorized amount.

Accordingly, we modify Davis's judgment to correct the amount of the state court construction penalty.  We affirm Bradley's judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Appellants Davis and Bradley, along with numerous other persons, participated in a scheme whereby, on five occasions in 2008 and 2009, the participants intentionally

2

caused motor vehicle accidents so they could collect monies from insurance companies. The vehicle that caused the accident is referred to as the "hammer" car, and the vehicle that was hit is referred to as the "nail" car. Typically, the staged collision scenario involved a person reporting a vehicle as stolen; the purportedly stolen vehicle operating as the hammer car; the persons in the nail vehicle reporting the hammer car driver as having fled the scene; and the scheme participants filing insurance claims based on damages arising from the incident.

The staged collision scheme included (among others) seven persons who are directly related to appellants Davis or Bradley. These relatives include: (1) four of Davis's cousins (Rodney Martin, Jiaire Martin, Wade Torbert, and Darryl Key, who are brothers or half-brothers to each other); (2) another one of Davis's cousins (Frank Torbert); (3) Bradley's father (Wade Bradley); and (4) Bradley's uncle (Edward Savage). Appellant Davis's cousin Wade Torbert was also appellant Bradley's half-brother. Other people involved in the scheme also had family ties to Davis or Bradley, including Michael Jones who was the cousin of Bradley's uncle Savage, and Shareese Spence whose mother was married to another one of Bradley's uncles. After an unsuccessful severance motion, appellants were jointly tried with seven other codefendants, consisting of Davis's cousins (Rodney Martin and Key); Davis's cousin and Bradley's half-brother

3

(Wade Torbert); Bradley's father (Wade Bradley); Bradley's uncle (Savage); and two other individuals (George Thomas and Lachae White).[1]

The prosecution charged numerous insurance fraud counts based on five distinct car collisions, occurring on January 18, 2008, March 10, 2008, April 29, 2008, January 5, 2009, and February 2, 2009. Davis was charged in the first and second incidents, on the basis that he had rented the nail car and was a passenger in the nail car during the first incident, and he reported the hammer car stolen for the second incident. Bradley was charged in the fourth incident, on the basis that he was a passenger in the nail car during this incident.

With respect to the first charged incident on January 18, 2008, the hammer car was reported stolen by its owner a few months before the collision, and it may have been in the possession of appellant Bradley's father (Wade Bradley) prior to the January 18 collision. Appellant Davis rented the nail car the day before the accident. The police were told that at the time of the accident, Davis's cousin (Rodney Martin) was driving the nail car, and the passengers in the car included Davis and two of his other cousins (Jiaire Martin and Wade Torbert).[2] Rodney Martin told the police that the driver of the hammer car fled on foot.

Regarding the second charged incident on March 10, 2008, the hammer car was owned by appellant Davis, and Davis had reported it stolen about two months before the

---

[1] At times we identify individuals by both their first and last names to avoid confusion when the surnames overlap.

[2] Two minors were also in the nail car.

4

accident. The police were told that the nail car was being driven by appellant Bradley's father (Wade Bradley), and its passengers were appellant Bradley's uncle (Savage) and Savage's cousin (Jones). Wade Bradley told the police that the driver of the hammer car ran away.

With respect to the third charged incident on April 29, 2008, the hammer vehicle had been rented by appellant Bradley's relative-by-marriage (Spence), and the night of the collision Spence reported that it had been stolen. The police were told that Thomas was driving the nail vehicle, and that the passengers in the nail vehicle were appellant Davis's cousins (Frank Torbert and Key) and two other persons (Jay Anderson and Lachae White).[3] Frank Torbert and Thomas told the police that the driver of the hammer vehicle left the scene.

For the fourth charged incident on January 5, 2009, Thomas reported the hammer vehicle (a rented vehicle) as stolen the night of the January 5 collision. The police were told that appellant Davis's cousin (Jiaire Martin) was the driver of the nail car, and the nail car's passengers were appellant Bradley and appellant Davis's cousin (Rodney Martin). According to the nail-car occupants, the driver of the hammer vehicle fled the scene.

With respect to the fifth charged incident on February 2, 2009, appellant Davis's cousin (Key) had reported the hammer car as stolen about four months before the collision. The nail-car driver (Mary Lett) told the police that the hammer-car driver had

_____

[3]     Anderson was a cousin of Frank Torbert, and Frank Torbert was a cousin of appellant Davis.

entered another car and fled the scene.  Lett later pled guilty and testified at trial that she had agreed to participate in a "fake car crash" arranged by her ex-boyfriend (Anderson, who had participated in the April 29, 2008 staged collision).

For the five incidents, the typical scenario was that persons in the nail car complained of pain; they were transported by ambulance to the hospital; and they thereafter sought (and frequently obtained) monies from insurance companies for their claimed damages.

*Jury Verdict*

Appellant Davis was charged with four insurance fraud offenses for incident one, and the same four offenses for incident two (counts 1 through 8).  Appellant Bradley was charged with the same four offenses for incident four (counts 13 through 16).  The four insurance fraud offenses associated with the incidents are set forth in Penal Code section 550 (section 550).  The relevant section 550 provisions state that it is unlawful to do, or assist or conspire with another person to do, any of the following:  (1) present a false claim for the payment of a loss or injury (§ 550, subd. (a)(1)); (2) cause a vehicular collision for the purpose of presenting a false claim (§ 550, subd. (a)(3)); (3) present a false claim for the payment of a loss for theft or damage to a vehicle (§ 550, subd. (a)(4)); and (4) present a false statement in support of a claim for payment under an insurance policy (§ 550, subd. (b)(1)).[4]

---

4    Section 550 states in relevant part:  "(a)  It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:  [¶]  (1) Knowingly present or cause to be presented any false or fraudulent claim for the payment

6

The jury convicted Davis and Bradley as charged. Appellants were granted probation conditioned on local jail time.

DISCUSSION

I. *Denial of Severance Motions*

Appellants argue the trial court erred in denying their motions to sever their trials from that of other codefendants so that the only incidents that would be tried at their respective trials would be the incidents in which they actually participated (i.e., incidents one and two for Davis, and incident four for Bradley). They contend that under the rule of *People v. Ortiz* (1978) 22 Cal.3d 38 (*Ortiz*), severed trials were mandatory because they were not jointly charged with all the codefendants in any count.

Penal Code section 1098 mandates a joint trial for defendants jointly charged with an offense, subject to discretionary severance of the trial by the trial court.[5] In *Ortiz,* the California Supreme Court interpreted Penal Code section 1098 as implicitly directing that "a joint trial is improper if there is no joint charge." (*Ortiz, supra*, 22 Cal.3d at p. 43.)

of a loss or injury, including payment of a loss or injury under a contract of insurance. [¶] . . . [¶] (3) Knowingly cause or participate in a vehicular collision, or any other vehicular accident, for the purpose of presenting any false or fraudulent claim. [¶] (4) Knowingly present a false or fraudulent claim for the payments of a loss for theft, destruction, damage, or conversion of a motor vehicle . . . . [¶] . . . [¶] (b) It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following: [¶] (1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact."

5      Penal Code section 1098 states: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials . . . ."

*Ortiz* stated: "[A] defendant may not be tried with others who are charged with different crimes than those of which he is accused unless he is included in at least one count of the accusatory pleading with all other defendants with whom he is tried." (*Id*. at pp. 41, 43 [defendant's trial on robbery charge should have been severed from codefendants' trial on robbery charge in which defendant had no involvement].)

The *Ortiz* severance rule is designed to prevent the jury from "hear[ing] evidence concerning a crime with which defendant had no connection." (*People v. Hernandez* (1983) 143 Cal.App.3d 936, 939.) " '[T]he consolidation of . . . separate unconnected charges for trial' [is] unfairly prejudicial to defendants . . . . ' "A defendant may be prejudiced if forced to stand trial on one charge with a codefendant or codefendants who are charged with a *distinct and unconnected offense*. The charges may be of the same class and therefore subject to consolidation, but if unconnected and dependent upon evidence of an entirely different state of facts, one defendant may be prejudiced by evidence introduced in support of an information charging a second defendant with a separate offense." ' " (*Id*. at p. 940, italics added.) "The evil sought to be avoided by *Ortiz* [is] the *prejudicial impact of irrelevant evidence*. In a joint trial of unrelated offenses, the jury would hear evidence concerning the conduct of defendant's associates, *which evidence would not have been admissible in a separate trial*." (*Ibid*., some italics added.)

Based on the underlying rationale of *Ortiz*, appellate courts have concluded that the *Ortiz* severance rule is subject to an exception when distinct offenses charged against separate defendants *arose out of a single set of circumstances*. (*People v. Hernandez,*

8

*supra*, 143 Cal.App.3d at p. 940.) When the offenses arose out of a single set of circumstances, and the evidence concerning a codefendant's offense *would have been admissible at the defendant's separate trial*, there is no concern for the admission of irrelevant evidence at a joint trial. (*Id.* at pp. 939-941 [*Ortiz* severance rule does not apply when defendants "committed offenses at the same time and place and as part of the same transaction"]; accord *People v. Wickliffe* (1986) 183 Cal.App.3d 37, 40-41.)

In the proceedings before the trial court, the prosecutor argued that the *Ortiz* severance rule was inapplicable because there was no concern for the prejudicial impact of irrelevant evidence at a joint trial. In support, the prosecutor asserted that even if the trials were severed, evidence of the entire car collision scheme would be admissible to prove each individual incident because the five charged incidents involved similarly-enacted collisions that were largely carried out by persons who had family connections and that occurred pursuant to a common plan or overarching conspiracy. During a lengthy discussion with counsel, the trial court evaluated whether the evidence of the multiple accidents would be cross-admissible in separate trials, and the court ultimately decided the evidence would be cross-admissible.

During the discussions, the court reasoned that the multiple-accident evidence was cross-admissible (1) to prove a common plan which was probative of intent and to support the individual counts on a conspiracy theory, and (2) to prove an overarching conspiracy if the prosecutor pursued an uncharged overall conspiracy theory, or amended the information to allege an overall conspiracy. Given the cross-admissibility of the evidence, the court ruled the *Ortiz* severance rule did not apply, and judicial economy

9

warranted a joint trial because the same evidence would be admitted whether the trials were joined or separate.[6]  The court also considered Evidence Code section 352 prejudice concerns based on the danger that the jury would find "guilt by association," and concluded exclusion was not warranted on this basis since evidence of association between the defendants was relevant to support culpability under a conspiracy theory.[7]

The record supports the trial court's conclusion that if Davis and Bradley had been afforded separate trials for the incidents in which they personally participated, the evidence about the other incidents would have been relevant and admissible.  At the preliminary hearing held prior to the trial court's denial of the severance motion, insurance fraud investigators described how the five charged car collision incidents occurred; specified the individuals who participated in the five incidents; and described the family relationships between many of the participants in the incidents.  This evidence

---

[6]     The court commented that although a joint trial appeared to "violate the holding" in *Ortiz*, a joint trial did not "violate[] the spirit" of *Ortiz* due to the cross-admissibility of the evidence.

[7]     After the court made its ruling on the severance motion, the prosecutor reiterated his position that the *Ortiz* severance rule was inapplicable, but in an "abundance of caution" requested leave to amend to allege an overarching conspiracy.  The court ruled that the amendment could be made, reasoning that at the preliminary hearing the magistrate must have found an overall conspiracy since otherwise there would be insufficient evidence to bind the case over for a trial on the individual counts.  The court noted that an overall conspiracy count would "cure any *Ortiz* issues" (since all defendants would be named in the overall conspiracy count).  At the conclusion of the court's ruling and after further discussion between the court and parties, the prosecutor decided not to amend the information to allege an overall conspiracy.  The prosecutor explained there was no need to do so because the court had not conditioned denial of the severance motions on an amendment, and because case law supported the inapplicability of the *Ortiz* severance rule even without an overall conspiracy count.

10

(which correlated with the evidence presented at trial) showed that the five charged incidents involved similar modus operandi, overlapping participants, and numerous participants with family connections. These circumstances supported that evidence concerning all of the crashes was relevant to shed light on the state of mind of all participants, including appellants Davis and Bradley, based on an inference that the participants were acting pursuant to a common scheme to engage in staged car collisions.

For example, for appellant Davis, if the first and second incidents had been tried separately from the other incidents, the relevant participants included Davis and several of his cousins (including Rodney Martin and Jiaire Martin) who participated in the first incident. The two Martin cousins also participated in the fourth incident. The Martin cousins' guilty states of mind during the first incident could be inferred from their participation in a similar-type collision in the fourth incident. (*People v. Miller* (2000) 81 Cal.App.4th 1427, 1448 [the recurrence of a similar result tends increasingly with each instance to negate accident or other innocent mental state].) In turn, appellant Davis's guilty state of mind during the first incident could be inferred from the fact that two of his companions during the collision (the Martin cousins) went on to repeat similar behavior on a subsequent occasion (i.e., during the fourth incident). (*Id*. at pp. 1448-1449 [evidence of codefendant's misconduct *without* defendant was relevant to show that defendant acted with same criminal intent during distinct incidents *with* codefendant involving *common modus operandi*].) Further, as to the third and fifth incidents, these incidents also involved people who were Davis's cousins (Frank Torbert and Key). It follows that evidence about the third and fifth incidents was relevant to Davis's

11

culpability for the first and second incidents to generally support an inference that Davis had a guilty state of mind given that his cousins were repeatedly involved in similar collision incidents and he had joined with some of them to engage in this conduct.

The same reasoning supports the cross-admissibility of evidence concerning the five incidents for appellant Bradley. For example, if the fourth incident involving Bradley was tried separately, the relevant participants included Bradley and the two Martin males (Rodney and Jiaire). Because the two Martins also participated in the first incident, the first incident was relevant to support their guilty states of mind during the fourth incident. In turn, the first incident was relevant to support an inference that Bradley shared the Martins' guilty states of mind during the fourth incident since he was with the Martins during this incident that mimicked a collision the Martins had engaged in on a previous occasion. Further, Bradley's father (Wade Bradley) and uncle (Edward Savage) were involved in the second incident; Bradley's relative-by-marriage (Spence) was involved in the third incident; and a person (Key) related to Bradley's half-brother (Wade Torbert) was involved in the third and fifth incidents.[8] Given Bradley's family ties with the participants in the second, third, and fifth incidents, evidence about these other incidents was generally relevant to support an inference that Bradley was apprised of what was occurring and intentionally participated in the fourth incident.

In short, the similar and intertwined nature of the five collision incidents supported that evidence about the five collisions was cross-admissible on the issues of a common

---

[8]    Wade Torbert is half-brother to both Key (same mother, different fathers) and appellant Bradley (same father, different mothers).

12

scheme and the defendant's intent in a separate trial adjudicating distinct incidents. That is, the evidence about all the incidents was relevant to a participant's intent during a single incident because the jury could reasonably infer that the factual similarity and overlapping participants and family relationships reflected that the participants knew what was occurring and were part of an overall scheme to stage multiple accidents. Because there was no concern that a joint trial would result in the admission of otherwise inadmissible evidence, the *Ortiz* concern about irrelevant evidence was not applicable, and it follows that the *Ortiz* severance rule was not implicated.

As noted by appellants, the cases setting forth the same-transaction exception to the *Ortiz* severance rule involved crimes committed by the defendants at the same time and place. (*People v. Hernandez, supra*, 143 Cal.App.3d at pp. 939-940; *People v. Wickliffe, supra*, 183 Cal.App.3d at pp. 40-41.) Although this case involves multiple separate occurrences, this distinction does not alter the fact that the underlying concern in *Ortiz* for admission of irrelevant evidence is equally absent here. Under these circumstances, the trial court did not err in finding the *Ortiz* severance rule inoperative.

Alternatively, for the same reason, even if the denial of the severance ruling was improper under *Ortiz*, the error was harmless. Severance error requires reversal "only upon a showing 'of a reasonable probability that the defendant would have obtained a more favorable result at a separate trial.' " (*Ortiz, supra*, 22 Cal.3d at p. 46.) Because the evidence about the five incidents was relevant and admissible on the issues of common scheme and each participant's intent during the distinct incidents, there is no reasonable probability the outcome of separate trials would have been more favorable to appellants.

13

Appellants assert that the trial court's conclusion that there was evidence of an overall scheme or conspiracy supporting cross-admissibility was contrary to an investigator's testimony at the preliminary hearing that there were two separate groups engaging in the car collision accidents. This contention is based on an incorrect summation of the preliminary hearing evidence. The investigator testified that there were essentially two separate groups staging car collisions in San Diego county; the first group had already been prosecuted; and the second group (in which there were numerous family connections) was charged in the current complaint.[9]

Appellants also assert that a common scheme or overall conspiracy could not support cross-admissibility of evidence because there was no evidence that they agreed to engage in such a scheme. The assertion is unavailing. To support culpability under a conspiracy theory, it is not necessary to show that the parties met and actually agreed to perform the crime or that they had previously arranged a detailed plan; rather the evidence is sufficient if it shows they positively or tacitly came to a mutual understanding to commit the crime. (*People v. Prevost* (1998) 60 Cal.App.4th 1382, 1399.) A conspiracy may be proven by circumstantial evidence inferred from the conduct, relationship, interests and activities of the alleged conspirators before and during the alleged conspiracy. (*Ibid.*) The preliminary hearing evidence reflecting that the five

---

9    The investigator explained that a person involved in the already-prosecuted first group (Jay Anderson) had family connections to several people in the second group, but there was otherwise not "really much relational crossover between the other parties" in the two groups; accordingly, the authorities viewed the participants as "kind of two separate groups."

charged incidents involved a similar modus operandi, overlapping participants, and participants with family connections provided sufficient circumstantial evidence to support that there was a tacit agreement between the participants in the accidents to join in a staged collision scheme, which allowed for cross-admissibility of the evidence in separate trials.

Appellants further argue that the prosecutor could not properly charge a conspiracy under the general conspiracy statute (Penal Code section 182) because the section 550 insurance fraud statute is a specific conspiracy statute that governs the alleged misconduct. We need not delve into this argument because the prosecutor elected *not* to amend the information to include an overall conspiracy count (see fn. 7, *ante*), and the court's cross-admissibility ruling was not dependent on any such amendment.

Appellants have presented no persuasive argument showing the trial court erred in allowing a joint trial based on the cross-admissibility of the multiple accident evidence to show a common scheme which could shed light on each participant's intent during the incidents in which he personally participated.

II. *Failure to Sua Sponte Instruct on Single Conspiracy*

*Versus Multiple Conspiracies*

The jurors were given an instruction on uncharged conspiracy principles that allowed them to find the defendants culpable for any of the charged offenses under a conspiracy theory. (See CALCRIM No. 416; *People v. Williams* (2008) 161 Cal.App.4th 705, 709 [conspiracy evidence may be introduced to prove liability even though no conspiracy is charged].) Numerous acts associated with the staged collision activity were

15

specified as the overt acts supporting the uncharged conspiracy. Because the jury was instructed on conspiracy principles, Davis contends the trial court erred because it failed to sua sponte instruct that the jury should decide whether there was a single conspiracy or multiple conspiracies.

Some appellate courts have concluded that a trial court is required to sua sponte instruct the jury to determine whether the facts show a single all-encompassing conspiracy or multiple, separate conspiracies when there is evidence to support alternative findings. (*People v. Meneses* (2008) 165 Cal.App.4th 1648, 1668-1671; *People v. Jasso* (2006) 142 Cal.App.4th 1213, 1220.) "Specifically, an instruction is warranted where the evidence could support a finding that there was one overall agreement among the various parties to perform various functions in order to carry out the objectives of the conspiracy." (*Jasso*, at p. 1220.) The rationale for giving the jury the option of finding that there is a single conspiracy is premised on the principle that "the essence of the crime of conspiracy is the agreement, and thus it is the number of agreements (not the number of the victims or number of statutes violated) that determine[s] the number of the conspiracies." (*Meneses*, at p. 1669.)

Unlike the circumstances in *Meneses* and *Jasso*, this is *not* a case where the defendant was charged and convicted under the *general conspiracy statute* (Pen. Code, § 182, subd. (a)(1)) of multiple counts of conspiracy, and the argument on appeal was that the jury should have determined whether the defendant should be liable for only one overall conspiracy under Penal Code section 182. (See *People v. Meneses, supra*, 165 Cal.App.4th at pp. 1667-1668; *People v. Jasso, supra*, 142 Cal.App.4th at pp. 1215,

16

1223.)  Appellants were charged and convicted of *four distinctly-defined insurance fraud offenses*, which could be committed by either direct perpetration, aiding or abetting, or conspiring.  (§ 550, subds. (a)(1), (3), (4), (b)(1); see fn. 4, *ante*.)  Although the jury was told it could consider the evidence of an uncharged conspiracy when deciding whether a defendant was guilty of a particular count, the jury was not given the option of convicting a defendant of one or more conspiracy counts under the general conspiracy statute.

Davis has not explained why a defendant's right to obtain a single conviction under the general conspiracy statute—which defines a crime focused on an illegal *conspiratorial agreement*—should extend to multiple statutorily-defined offenses that can, *but need not be*, committed by conspiratorial conduct.  Absent persuasive authority or argument on this point, we decline to apply the instructional principle applicable to the general conspiracy statute to this case involving multiple offenses that can be committed without a conspiratorial agreement.[10]

### III.  *Instruction on Uncharged Crimes*

Davis contends the trial court erred in instructing the jury on uncharged crimes evidence, particularly when considered with its instruction on uncharged conspiracy.

The prosecution presented evidence of several occurrences that were not directly part of the events underlying the charged incidents, but that were related to the prosecution's theory that the defendants were involved in a fraudulent car collision

---

[10]    Given our holding, we need not determine whether the facts here are amenable to a finding that there was only one overall conspiracy, as opposed to multiple independent conspiracies notwithstanding a common overall goal.

scheme. For example, these uncharged events included several staged collisions in 2008 arranged by Jay Anderson (one of which involved codefendant Wade Torbert), and a stolen car report on December 8, 2008, by appellant Bradley.

Over defense objection, the jury was instructed that the prosecution had presented evidence that "the defendants had committed other offenses that were not charged in this case" and that this evidence could be considered for the limited purpose of deciding whether the defendant acted with the intent to defraud, the defendant knew the claims were false, or the defendant had a plan or scheme to commit the alleged offenses. (See CALCRIM No. 375.)

Davis asserts the instruction was improper because there was no evidence linking him to the uncharged misconduct. We find no error. Although Davis was not directly involved in the uncharged misconduct, other codefendants and purported coconspirators were. Moreover, the uncharged misconduct evidence was admitted to support the existence of a common staged car collision scheme, which was relevant to each defendant's state of mind, including Davis's. (See *People v. Miller, supra*, 81 Cal.App.4th at pp. 1447-1449 [evidence of codefendant's uncharged misconduct admissible to show defendant's intent during charged offenses under common scheme theory]; see generally *People v. Cooks* (1983) 141 Cal.App.3d 224, 313 ["evidence of uncharged crimes may be admissible as proof of the common design or plan of the conspiracy"].) The jury was properly told that it could consider the uncharged crimes evidence for the limited purpose of evaluating a defendant's state of mind, and there is

nothing to indicate the jury used the evidence in any improper fashion to Davis's detriment.

## IV. *Admission of the Family Relationships Chart*

The prosecution was permitted to submit into evidence a chart depicting the family relationships between the various participants in the car collision incidents. Davis contends the trial court erroneously overruled his undue-prejudice objection to the chart because it included persons who had already pleaded guilty; not all of his family relationships were included in the chart which resulted in a "skewed appearance of a close-knit connection"; and the layout suggested he had a factually-unsupported close family relationship with one of the staged-collision organizers, Jay Anderson.

We review the admission of demonstrative evidence for abuse of discretion. (*People v. Mills* (2010) 48 Cal.4th 158, 207.) We have viewed the chart and find no abuse of discretion in its admittance. The chart was a useful demonstration of the rather complicated familial connections between the various participants, which was highly relevant to support the prosecution's common scheme theory of culpability. There is nothing to suggest that the jury might have used the chart to draw inaccurate or misleading conclusions about Davis's connections to the participants in the various collision incidents.

## V. *Cumulative Error*

Because we have rejected the asserted claims of error, we reject Davis's contention that the cumulative effect of error requires reversal.

19

VI. *Sentencing-Related Contentions Raised by Davis*

A. *Amount of State Court Construction Penalty*

Davis asserts that a state court construction penalty imposed upon him under Government Code[11] section 70372 exceeded the amount authorized under the statutory scheme in existence at the time he committed the offenses. He contends his penalty should have been $40 less. We agree.

To comply with the prohibition on ex post facto punishment, the amount of the state court construction penalty fine is determined by the statutes in existence at the time the defendant committed the crime. (*People v. Voit* (2011) 200 Cal.App.4th 1353, 1374-1375; *People v. High* (2004) 119 Cal.App.4th 1192, 1197-1198; see *People v. Batman* (2008) 159 Cal.App.4th 587, 591.) Accordingly (except as otherwise indicated), we refer to the Government Code statutes in existence in 2008 when Davis committed the offenses.[12] Section 70372, subdivision (a)(1) provided for a $5 penalty rate ($5 for every $10 of the base fine) to be levied as a state court construction penalty.[13] (Stats.

---

[11]    Subsequent unspecified statutory references are to the Government Code.

[12]    We cite the 2008 versions of the statutes without using the term "former." Bradley has not challenged the amount of the state court construction penalty imposed on him. Bradley committed his offenses in 2009, at which time the statutory scheme was not the same as in 2008 when Davis committed his offenses. (See § 70375, subd. (b); Stats. 2007, ch. 302, § 3; Stats. 2008, ch. 311, § 8.) Because Bradley has not challenged the state court construction penalty imposed on him under the statutes in existence in 2009, we address the issue only for Davis.

[13]    The $5 penalty rate was calculated as "five dollars ($5) for every ten dollars ($10), or part of ten dollars ($10), upon every fine, penalty, or forfeiture imposed and collected by the courts for all criminal offenses . . . ."  (§ 70372, subd. (a)(1).)

20

2007, ch. 302, § 2.)  Section 70372, subdivision (a)(2) provided for a reduction of this penalty under the terms of section 70375 subdivision (b).  (Stats. 2007, ch. 302, § 2.) Section 70375, subdivision (b)(1) stated that the $5 state court construction penalty shall be reduced by the amount collected for the "*local courthouse construction fund*."[14] (Stats. 2007, ch. 302, § 3, italics added.)

The amount of money collected for the local courthouse construction fund (which would reduce the section 70372 $5 state court construction penalty) was ascertainable by reviewing a chart set forth in section 76000.  (See *People v. Voit, supra*, 200 Cal.App.4th at p. 1375; § 70375, subd. (b)(1).)  Section 76000 imposed an additional $7 penalty ($7 for every $10 of the base fine); this penalty was reduced for particular counties based on the amount collected for the local courthouse construction fund.  (§ 76000, subds. (a)(1), (e); Stats. 2007, ch. 302, § 4; see *People v. Voit, supra*, 200 Cal.App.4th at p. 1375; *People v. McCoy* (2007) 156 Cal.App.4th 1246, 1253-1254.)  The section 76000 chart at the time of Davis's offenses in 2008 shows that San Diego County's rate was $5, which meant that $2 was collected for the local courthouse construction fund.  (§ 76000, subd. (e); Stats. 2007, ch. 302, § 4.)  Accordingly, under the terms of section 70375 at the time of Davis's offenses, the $5 state court construction penalty rate was required to be

---

14      Section 70375, subdivision (b) stated: "In each county, the five-dollar ($5) penalty amount authorized by subdivision (a) of Section 70372 shall be reduced by the following: [¶] (1) The amount collected for deposit into the local courthouse construction fund established pursuant to Section 76100.  If a county board of supervisors elects to distribute part of the county penalty authorized by Section 76000 into the local courthouse construction fund, the amount of the contribution for each seven dollars ($7) is the difference between seven dollars ($7) and the amount shown for the county penalty in subdivision (e) of Section 76000."  (Stats. 2007, ch. 302, § 3.)

21

reduced (by $2) to $3 (i.e., $3 for every $10 of the base fine, rather than $5 for every $10 of the base fine).

In contrast, the section 76000 chart at the time of *sentencing* in 2012 shows that San Diego County's penalty rate was $7, which meant that no monies were collected for the local courthouse construction fund. (Stats. 2010, ch. 720, § 26.) Apparently using the 2012 chart, Davis's section 70372 state court construction penalty was based on the full $5 penalty.[15] Based on the applicable 2008 chart, his section 70372 state court construction penalty should have instead been based on the $3 penalty amount. (See *People v. McCoy, supra*, 156 Cal.App.4th at p. 1254; *People v. Voit, supra*, 200 Cal.App.4th at p. 1375.)

More specifically, the record shows that Davis's base fine was $200, and he was charged a penalty assessment of $28 for every $10 of the base fine, totaling $560 in penalty assessments (i.e., 10 percent of $200 base fine ($20) times $28). The $28 calculation included the $5 penalty rate for the state construction penalty.[16] Because the state court construction penalty should have been calculated at the $3 (instead of $5) rate in existence at the time of Davis's crimes, the total penalty rate should have been $2 less; i.e., $26 (instead of $28) for every $10 of the base fine. This reduces the total penalty

---

[15]    In its respondent's brief, the Attorney General relied on the 2012 version of the section 76000 chart to support the state court construction penalty imposed by the trial court, whereas ex post facto principles require use of the 2008 chart.

[16]    We grant Davis's unopposed motion for judicial notice of a superior court document reflecting the penalty assessment amounts used at the time of sentencing, which sets forth the $5 state court construction penalty rate.

assessment for Davis by $40 to $520 (i.e., 10 percent of $200 base fine ($20) times $26).

We shall modify the judgment accordingly.[17]

### B. *Davis's Ability To Pay Booking Fee*

Davis argues it was improper for the trial court to impose a $154 booking fee on him under section 29550.1 because the record does not support that he had the ability to pay.

Assuming arguendo (without deciding) that section 29550.1 requires a showing of ability to pay, Davis's challenge to the booking fee is unavailing for several reasons.[18] First, he failed to object to the fee based on inability to pay, which constitutes a forfeiture of the issue on appeal. (*People v. McCullough* (2013) 56 Cal.4th 589, 591, 597-599.)

Second, Davis cannot prevail on his claim that his counsel provided ineffective representation by failing to object because the record supports an implied finding that Davis had the ability to pay. To succeed on an ineffective representation claim, a defendant must show that counsel's conduct fell outside the wide range of reasonable professional assistance and there is a reasonable probability of a more favorable outcome absent the error. (*People v. Valenzuela* (2013) 220 Cal.App.4th 159, 167-168.) According to the probation report, Davis (age 23) has a GED, has attended junior college, plans to attend college and earn a degree in psychology and business management, and

---

17    Because we can correct the error by modifying the judgment, there is no need for a remand as requested by the Attorney General.

18    Unlike some other booking fee statutes, section 29550.1 contains no provision expressly requiring a consideration of ability to pay. (Compare §§ 29550, subd. (d)(2), 29550.2, subd. (a).)

has been employed at various retail stores. Although he was unemployed at the time of the probation officer's interview, this does not foreclose a conclusion that he could obtain employment in the foreseeable future. (*People v. Frye* (1984) 21 Cal.App.4th 1483, 1487 [court may consider defendant's ability to pay fine in the future; " '[a]bility to pay does not necessarily require existing employment or cash on hand' "]; *People v. DeFrance* (2008) 167 Cal.App.4th 486, 505.) Because the record supported ability to pay, counsel was not ineffective for failing to raise this objection.

DISPOSITION

For appellant Bradley, the judgment is affirmed.

For appellant Davis, we modify the judgment to reduce the penalty assessment from $560 to $520. Thus, the total amount he owes is reduced by $40. As so modified, the judgment is affirmed.

HALLER, J.

WE CONCUR:

McCONNELL, P. J.

McINTYRE, J.

24