Filed 3/26/25  P. v. Soliman CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MAHER SOLIMAN,<br><br>        Defendant and Appellant. | A168757<br><br>(San Francisco City & County<br>Super. Ct. No. SCN234245) |

A jury convicted defendant Maher Soliman of one count of grand theft by false pretenses and two counts of extortion.  On appeal, defendant contends the grand theft charge is time-barred and the trial court erred in failing to instruct the jury on the litigation privilege as a defense to the extortion counts.  We affirm.

## BACKGROUND

In 2013, Wondwossen Mekbeb was working as a taxi driver.  He also leased a four-room office space, which he subleased to various tenants.

Defendant entered the picture when he responded to an online ad Mekbeb placed to rent out some of the office space.  Defendant told Mekbeb he was " 'interested in starting a legal office.' "  He said he had been a "federal prosecutor for a pretty long time," he had worked in Iraq, and he was "one of the guy[s] who interrogated Sadam Hussein."  Defendant also said he was a lawyer "working for the State Department."

1

Mekbeb agreed to sublease the space, and defendant prepared a rental agreement.  Defendant moved into the office space in November 2013.

Besides Mekbeb, there was one other tenant in the space, Karley Greer.  Mekbeb introduced Greer to defendant, and defendant represented he was "a federal prosecutor and a lawyer."  Mekbeb saw "several pictures" in defendant's office, including a framed "very huge picture of his law degree" and pictures of defendant with former Secretaries of State Hillary Clinton and Colin Powell.  Defendant also showed Mekbeb his Web site where he advertised his business.  When Mekbeb saw defendant's "Doctorate of Law," he thought he "was a Ph.D. and a lawyer, too, and also a federal prosecutor.  So it was somebody big for me, basically a very giant, educated person."

For the next four months, defendant would "bring people to the office, and he will lock the door, he does some work for them, and he will go home."

During that time, Mekbeb and defendant became friendly, and Mekbeb eventually told defendant about an "idea for a lawsuit" involving taxicab drivers and hotels.  Mekbeb gave defendant letters another attorney had sent to "various hotels in San Francisco" on Mekbeb's behalf and "denial letters" Mekbeb had received from the hotels.

Defendant took the letters, "studied the case," and then told Mekbeb "he will take the case."  Defendant also urged Mekbeb to hire a private investigator, which Mekbeb did, spending in the range of $12,000 to $15,000 on the investigation.  Mekbeb turned over to defendant all the evidence obtained by the investigator.

When Mekbeb hired defendant to take his case he believed defendant was a lawyer.  Indeed, defendant explicitly told Mekbeb, " 'I'm your lawyer. I'm representing you.' "

Defendant "prepared the lawsuit" and asked Mekbeb to pay him $5,000[1] "to represent me and to file the lawsuit." In July 2014, after defendant prepared and "printed the lawsuit," defendant and Mekbeb went to the superior court together to file the complaint. Mekbeb did not review the complaint before he signed it, so he was unaware it said he was appearing in propria persona.[2]

After the hotels demurred, Mekbeb panicked because he did not know what was happening, and "it was pretty big." Defendant reassured Mekbeb he would respond to the demurrer and not to worry. First, however, defendant "demanded" that Mekbeb "pay $15,000 extra," otherwise defendant would not respond. Mekbeb, believing he was now "stuck in a massive lawsuit" and that defendant was his attorney, agreed to pay him.

In September, Mekbeb and defendant signed an attorney-client fee agreement for the purpose of establishing that defendant, and a second attorney, would "represent me [Mekbeb] in court, in the lawsuit." The agreement provided, in part, "This ATTORNEY CLIENT FEE AGREEMENT ('Agreement') is between WONDWOSSEN MEKBEB ('Client'), and Jeffrey Goodman, Esq.[3] assisted by Maher Soliman, JD of DIY Legal to perform legal services." Defendant understood this was a "legal agreement between [Mekbeb], [defendant's lawyer] friend that [Mekbeb did not] know, . . . , and

---

[1] At trial, only $4,500 in payment in checks were mentioned, but both parties agree defendant asked for, and Mekbeb paid, $5,000.

[2] Defendant did not sign any of the pleadings or filings he prepared in the lawsuit against the hotels. Instead, all papers were signed by Mekbeb in propria persona.

[3] Goodman, who is licensed to practice law, testified he never met defendant and had no knowledge of the case.

3

Maher Soliman. Two of them was supposed to represent [Mekbeb] in court." Mekbeb believed he had "two top-gun lawyers."

In addition to the fee agreement, Mekbeb signed a "PROMISSORY NOTE," providing that he would pay defendant $15,000, of which $2,500 had already been paid, and that, as part of the agreement, Mekbeb would no longer charge defendant rent for the office space. Mekbeb stated he signed the note because defendant "is supposed to be an attorney, and I sign for his work, and if I don't pay him, so he can sue me." Mekbeb also understood that if he won the lawsuit, defendant would get additional money.

That same month, defendant prepared the opposition to the hotels' demurrer. Mekbeb and defendant then "went together to the printing place again" to print the opposition and file it electronically. During this time, a process server Mekbeb had hired told Mekbeb the server's sister was an attorney and she had said there "is no Maher Soliman in California." Mekbeb "brushed it off and I told [the process server] that's nothing, because, I told him, [defendant is] a federal prosecutor. So I said it doesn't mean nothing, because I told him he's a federal prosecutor. In my mind, he's always like a giant, big prosecutor, basically." Mekbeb did not know exactly "what a federal prosecutor is, but in [his] opinion it means like a federal lawyer. Like you're a local California attorney, but he is a federal lawyer. He can go anywhere, he can sue anybody, he can practice anywhere on Earth. That it is what I thought about him."

There were several hearings in the hotel lawsuit in November and December 2014, and hearings, again, in March and April 2015.

Mekbeb had no recollection of the November 2014 hearing, at which he had appeared without defendant. On cross-examination in the instant case, defense counsel attempted to refresh Mekbeb's memory with the transcript of

4

that hearing. Specifically, counsel asked Mekbeb why he did not tell the court he had an attorney when the trial judge stated on the record, "Mr. Mekbeb represents himself. I advised Mekbeb to make every effort to obtain counsel and asked if he wished for a stay while he did so."[4] Mekbeb said he had no memory of having that conversation with the judge.

Mekbeb did recall the December hearing. On the day of that hearing, he had gone to pick up defendant to go to the courthouse, but defendant told Mekbeb he "was sick" and unable to attend. Mekbeb had then asked about his other attorney, Goodman, but defendant told him Goodman was "an alcoholic, and he's in drug rehabilitation." Defendant instructed Mekbeb, "Just go there, sit down. After the other guy present everything, just tell the judge only one word. I will amend." "Don't say nothing, but just tell the judge you will amend." So that is "what [Mekbeb] exactly did in the court."

At the hearing, "the judge and the other side lawyer talk, and when the judge asked me, he told me you have to amend, and then he said you really should get a lawyer." Mekbeb, again, did not explain that he had counsel. He had thought to himself, "I already have a lawyer. Your Honor, you don't know, but I have lawyers. In my mind that's what I was saying."

Mekbeb spoke to defendant later that day. Defendant said he had already called the court to "hear the decision" and "was very, very happy. He said I won. I'm a big lawyer." Defendant told Mekbeb, he had to "amend a few things . . . but he was very happy, and I was happy, too."

---

[4] The judge had further stated on the record that Mekbeb said "he was not currently engaged" in discussions to retain counsel and "declined my offer of a stay, and asked for the case to proceed, including resolution of motions desired below." Mekbeb subsequently told the judge, "he may retain counsel at a later date."

During the next months, Mekbeb and defendant would meet "[a] lot," and defendant would explain things about the lawsuit, "like fraud, unfair business practice. He was telling me about something called the Cartwright Act."

In advance of the March 2015 hearing, defendant prepared and filed an amended complaint, which was largely copied from a pleading filed by the California Attorney General's Office. The hotels again sought dismissal of the case. At that point, Mekbeb "really panicked. [Defendant] did a complete fraud. He copied somebody else's lawsuit and change[d] a few things and put it as [h]is, and the opposition attorney, they find out, and they attach the other lawsuit and presented [it] to the judge I believe to dismiss the case." Mekbeb again asked defendant about the other attorney that was supposedly representing him, but defendant "kept insisting [he] is in drug rehabilitation." Defendant again refused to go to the March hearing.

Instead of attending the March hearing by himself, Mekbeb hired another attorney, but did not tell defendant. He stated, "[Defendant] is not willing to go, what am I supposed to do, go ahead and look like a fool? I don't even know what to expect." But he still considered defendant his attorney. The other attorney only represented him at the March hearing.

At the hearing, "the judge was very, very, very angry," and Mekbeb thought "the case is going down the tube, and then he [the trial judge]—I believe he dismissed most of the case except one, and the case was done, in my opinion, at that time."

When Mekbeb went to defendant's apartment later that day, defendant called the court "and they told him what the judge decided, and then that's when he find out [Mekbeb] took the lawyer with [him]." Defendant was "pretty angry."

6

A few days later, defendant wanted to "file something called Motion for Reconsideration and something, and [Mekbeb] was 100 percent against it. [He] didn't even want to get close to any courthouse or anything." At that point, defendant "start blackmailing me." Defendant told Mekbeb, he (Mekbeb) "have lied to the Court, and if [Mekbeb] didn't go with what he want to file, [defendant] said he's going to go directly and show the judge that [Mekbeb] misled the Court, and that's a felony, and [Mekbeb was] going to jail." Mekbeb believed him, and the two went together to print the document and file it electronically. By that time, their relationship was "very sour," and Mekbeb asked defendant to return all the correspondence and evidence he had given him, but defendant said "he lost it."

After the motion for reconsideration was filed, Mekbeb still thought defendant was an attorney. He "might be suspicious, but I don't know. He's telling me he's a federal lawyer, a federal prosecutor, so I really don't know whether he's a federal lawyer, a local lawyer, or what. I still think he was a lawyer, yes." Defendant never told him he was not a lawyer.

Defendant also did not attend the April 16 hearing. Instead, Mekbeb again sent another attorney.

Four days after the hearing, on April 20, Mekbeb was still paying defendant and he had "$4,000 left to pay." Taking along a friend, Mekbeb went to see defendant and asked, "please give me that hotel paper back. Whatever money is left, you're going to get it, and then he agreed, and I give him three checks . . . one check for $2,000, and then two post-dated checks for the next two weeks." The money was for the attorney fees he still owed defendant and to "obtain . . . my own hotels paper back from him. It was a payment, basically like another extortion, too." Defendant told Mekbeb, "I'll give you back the hotel papers if you pay me."

7

Defendant immediately cashed the check dated April 20. But the next day he called Mekbeb and told him his "ex-wife found out about the deposit that [Mekbeb] gave [him], and she took all [his] money." Defendant told Mekbeb to "call [his] bank and tell them it's not [his] signature and it's stolen, and they will give you back cash-money and bring it and give it to [defendant]."

Mekbeb thought, "oh, my God, this guy is going to trap me again, and so I went to the bank I told him exactly what he told me," and the bank closed his account. Mekbeb sent defendant an e-mail explaining the situation and asked defendant to return his checks. He later sent a second e-mail. Defendant ignored the e-mails and vacated the office space on July 1.

Mekbeb testified on direct examination that he continued to believe defendant was his attorney "in April," although he described their relationship as "almost I'm doing something by force, by blackmail, by threat."

A juror eventually requested that Mekbeb be asked "on what date, day, month, year, but as precise as you can be, did you understand that Mr. Soliman was not an attorney?" Mekbeb responded, "It was probably just before the other lawyers took over the case. Close to that. Because repeatedly he didn't want to go with me to court. The other partner of his, I never see him, so I was pretty desperate, and I was questioning myself why he is not going with me if he's my lawyer and he's writing everything. [¶] . . . [¶] The date could probably be very close to April 2014, just before the other attorneys took over. Just before that I felt comfortable in that this guy might not be a lawyer. Why wouldn't he go with me?" On redirect, Mekbeb said he meant, "April 20*15*." (Italics added.)

8

Mekbeb did not, at the time, make any complaint to law enforcement about defendant's conduct.

Three years later, in April 2018, defendant sent Mekbeb a letter requesting payment of the outstanding amount—that is, the $2,000 that would have been paid through the post-dated checks. He followed this up with an e-mail "threatening . . . saying that [Mekbeb] have given him a check when there is no money in the bank, and it's two checks, and I have to make it a felony for each check. [Mekbeb is] going to jail for three years each, for six years, if I don't come and give him the money or give him another check, whatever he wants." Mekbeb ignored the letter and e-mail, although he was "terrified again, because it's another blackmail telling me I have given him bad check and for each check I'm going to go to jail for three years." Defendant also sued Mekbeb in small claims court.

Defendant then sent Mekbeb another e-mail, this time telling Mekbeb he was "going to lose my citizenship, and [he will] be deported."

At that point, Mekbeb reported defendant to the State Bar.

Mekbeb was then contacted by an inspector with the San Francisco District Attorney's Office, Eric Tejada, who conducted an initial phone interview with Mekbeb. Thereafter, Tejada and an Assistant District Attorney, Theis Finlev, conducted four in-person interviews.

During the October 2018 phone interview, Mekbeb told Tejada he "probably" realized defendant was not an attorney "before I appeared in court, for sure. Maybe a few weeks before I had to appear" in December 2014. In a November in-person interview, Mekbeb told Finlev and Tejada that in September or October 2014, a process server told him the server's sister had searched for, but had been unable to locate, defendant on the California Bar Web site. However, Mekbeb did not think that mattered

9

because defendant had told Mekbeb he was a federal prosecutor. In December, was the "first time [he] got suspicious." But Mekbeb "still considered [defendant] a federal lawyer, but maybe he have no right to practice in this state, yeah." In several interviews, Mekbeb said he thought that because defendant was a "federal prosecutor" he could practice anywhere.

Finlev repeatedly asked Mekbeb why he continued to pay defendant if he thought he was not an attorney. Mekbeb gave various answers. He said he was "already trapped in the lawsuit," defendant was "a lawyer, and not only that but [defendant] just [kept] demanding," and defendant "was writing the papers to respond to whatever that side is saying."

A juror requested that Tejada be asked, "Over the course of the multiple interviews with Mr. Mekbeb did he ever pinpoint the date when he found out that [defendant] is not a California licensed attorney?" Tejada replied, "I don't have a specific date."

Defense counsel asked Mekbeb about Finlev's question, "why were you still paying him to do legal work, do you remember the answer" and Mekbeb's response that "he was writing papers to respond to whatever that side was saying," given that all such papers were filed well before April 20th. Mekbeb acknowledged he "could have said that," but added "I still have an agreement with him. [¶] What happened with my—the client/lawyer agreement between him and Mr. Goodman? [¶] . . . [¶] . . . [T]he fact is I hired him, I hired Jeffrey Goodman, I signed an agreement, and they start to work the lawsuit for me."

On redirect, the prosecutor asked Mekbeb about another of Finlev's interview questions—specifically, "What did you believe [defendant] was to you from March 1, 2015, through April of 2015?" Mekbeb replied, "My federal prosecutor. My lawyer. My representative in the lawsuit."

At the close of evidence, defendant moved to dismiss the theft by false pretenses count on the ground it was time-barred. Defendant argued the only payment made to defendant within the limitations period—the April 20, 2015, payment—was not paid because Mekbeb believed defendant was a lawyer, but rather was paid to regain possession of the papers defendant would not return. In short, as defendant saw it, Mekbeb did not write the check because he was, at that point, under any illusion defendant was a lawyer and he therefore did not part with the funds under that false pretense. The People opposed the motion, arguing "An 'important reason' Mr. Mekbeb continued to make payments, even if he had, at some point, discovered or suspected that [defendant] was not an attorney, was that he thought he could be sued if he didn't pay it—because he believed he owed this money to [defendant] based on the promissory note he *only* signed believing the false pretense that [defendant] was an attorney."

The trial court commented, "The People raise an interesting point in their opposition papers that these last two checks that you're saying should be basically separated from the analysis as to theft by false pretenses, because they go only to extortion, because Mr. Mekbeb at that time was well aware, he was no longer under any misimpression that [defendant] was an attorney, but do you have any case law that points to if Mr. Mekbeb is still feeling as though he needs to act in a particular way because of a representation upon which he relied at a previous time, that takes out of the realm of theft by false pretenses?"

Defense counsel stated he did not but argued "there's zero evidence that that's what he thought on April 20th. There is ample evidence he thought I got to get this check to him; otherwise, I'm not getting these papers back." The People reiterated that Mekbeb thought he could be sued for

11

failure to make those payments, that it was telling the amount of the last three checks completed the $15,000 agreed-upon "attorney" fee, and even if there were other reasons Mekbeb made the payment, he had agreed to pay defendant believing he was an attorney.

The court denied the motion, and the jury convicted defendant of one count of grand theft by false pretenses occurring over a course of time (between March 1, 2014, and April 21, 2015)[5] and two counts of extortion based on the threats occurring in April and June 2018[6] The trial court placed defendant on two years' formal probation.

## DISCUSSION

### *The Theft by False Pretenses Count*

The trial court instructed the jury, without objection, as to the timeliness of the grand theft by false pretenses count as follows: "A defendant may not be convicted of Theft by False Pretenses unless the prosecution began within 4 years of the date [of] the crime's completion. The present prosecution began on April 18, 2019. [¶] For fraud related charges, the statute of limitations is four years, and the time begins to run after the completion of the offense or the discovery of the offense, whichever is later.

---

[5] During this approximately 14-month time period, Mekbeb paid defendant the following sums: (1) March 1, 2014–$1000; (2) March 10, 2014–$1,000; (3) April 15, 2014–$2,500; (4) September 2, 2014–$500; (5) September 2, 2014–$2,500; (6) October 31, 2014–$2,000; (7) January 9, 2015–$2,000; (8) January 30, 2015–$2,000; (9) February 9, 2015–$2,000; (10) March 13, 2015–$1,000; (11) April 20, 2015–$2,000; (12) April 20, 2015 (post-dated May 5, 2015)–$1,000 (payment stopped); (13) April 20, 2015 (post-dated May 25, 2015)–$1,000 (payment stopped).

[6] The jury found defendant not guilty of one count of theft by false pretenses which allegedly occurred between September 1, 2014, and June 30, 2015, based on "the rent that [defendant] did not have to pay."

12

[¶] The People have a burden of proving by a preponderance of the evidence that the prosecution of this case began within the required time. This is a different standard of proof than proof beyond a reasonable doubt. To meet the burden of proof by a preponderance of the evidence, the People must prove that it is more likely than not that prosecution of this case began within the required time. If the People have not met this burden, you must find the defendant not guilty of Theft by False Pretenses." (CALCRIM No. 3410; Pen. Code, §§ 801.5, 803.)

As the instruction states, the four-year limitations period is triggered either by the date of completion of the crime or the date of discovery of the offense, whichever occurs later. In the instant case, the prosecution, having charged the offense as continuing from March 1, 2014, to April 20, 2015, proceeded under the "date of completion" prong of the limitations period. Accordingly, the court did not include in the jury instruction the optional instructional language on "discovery."[7] (*In re Parks* (1986) 184 Cal.App.3d 476, 479 (*Parks*).)

The offense of grand theft by false pretenses is complete for purposes of the limitations period " 'when every act which is an element of the offense has occurred." ' (*Parks, supra*, 184 Cal.App.3d at p. 479, fn. 6.) The elements of the crime of theft by false pretenses are: "(1) the defendant made a false pretense or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the

---

[7] This optional language states: "*A crime should have been discovered when the (victim / law enforcement officer) was aware of facts that would have alerted a reasonably diligent (person / law enforcement officer) in the same circumstances to the fact that a crime may have been committed.*" (CALCRIM No. 3410, italics added.)

13

property to the defendant in reliance on the representation." (*People v. Wooten* (1996) 44 Cal.App.4th 1834, 1842.) As was the case here, multiple acts of grand theft committed over the course of several months and pursuant to a single scheme may be charged as one count of grand theft. (*People v. Whitmer* (2014) 59 Cal.4th 733, 742.) And where multiple acts of theft constitute a single continuing offense, prosecution is timely "as long as the *completion* of the course of conduct lies within the statutory period." (*People v. Keehley* (1987) 193 Cal.App.3d 1381, 1386.)

As he did in the trial court, defendant maintains on appeal that the theft by false pretenses count is "barred by the statute of limitations and otherwise not supported by the substantial evidence." (Boldface omitted.) Defendant contends that while Mekbeb wrote approximately 13 checks between March 1, 2014, and April 20, 2015 (see fn. 5, *ante*), "the vast majority of the payments were time-barred" and, in fact, the *only* payment made within the limitations period was the April 20, 2015, check that was cashed. Defendant acknowledges that if that check was written "in reliance on [defendant's] false representations, then it—and the entire course of conduct—would not be time-barred." But he maintains the payment was not made in reliance on defendant's false representation he was a lawyer, but rather, was made when defendant no longer believed defendant was an attorney and was made to regain possession of the documents defendant was wrongfully withholding from him. In short, defendant argues there is no evidence that can support a finding, even under a preponderance of the evidence standard, that on April 20, 2015, Mekbeb still believed defendant was an attorney.

Defendant focuses on Mekbeb's response to the juror question that asked Mekbeb " '[o]n what date, day, month, year, but as precise as you can

14

be, did you understand that [defendant] was not an attorney.' " As we have recited, Mekbeb replied to the jury's question as follows: "It was probably just before the other lawyers took over the case. Close to that. Because repeatedly he didn't want to go with me to court. The other partner of his, I never see him, so I was pretty desperate, and I was questioning myself why he is not going with me if he's my lawyer and he's writing everything. [¶] . . . [¶] The date could probably be very close to April 2014 [*sic*], just before the other attorneys took over. Just before that I felt comfortable in that this guy might not be a lawyer. Why wouldn't he go with me?"

Defendant asserts that while Mekbeb "had difficulty pinpointing precisely when he realized that [defendant] was not in fact a licensed attorney, [he] *was clear that by the time he had hired the two other attorneys*"—which, at the latest was by April 16th, the date of the second 2015 conference in the hotel case and *before* he made the April 20th payment. (Italics added.) Defendant also points to Mekbeb's testimony that he wanted to get his documents back and defendant told him he would return the documents if Mekbeb paid him.

We do not agree the evidence is as open and shut as defendant urges. When Mekbeb was asked if he still believed defendant was an attorney when defendant filed the motion for reconsideration toward the end of March 2015, he replied, "I think so. I might be suspicious, but I don't know. He's telling me he's a federal lawyer, a federal prosecutor, so I really don't know whether he's a federal lawyer, a local lawyer, or what. I still think he was a lawyer, yes." And although Mekbeb described his and defendant's relationship as of March and April as "almost I'm doing something by force, by blackmail, by threat," he also testified that at the end of March through April, he still believed defendant was his attorney. Indeed, when Mekbeb was re-asked a

15

question posed by Assistant District Attorney Finlev in one of the interviews—specifically, "What did you believe [defendant] was to you from March 1, 2015, through April of 2015"—Mekbeb testified, "My federal prosecutor. My lawyer. My representative in the lawsuit."

There is no question Mekbeb's testimony was largely equivocal and at times contradicting. As defendant points out, Mekbeb testified at one point, "I just don't know exactly when I knew [defendant was not a lawyer]. It is after—after I retain the final two lawyers and to find out he's not a lawyer. Somehow I find out, but by the time I find out, the case was in the hands of the other lawyers, anyway, I believe. [¶] But I can't remember everything. Like important things or emails that sent or that I have, I can't remember that. Like when he sent money demand to me, since I have the email, too, I can remember things like that, but when did you find out that he was not a lawyer, that's a difficult question to answer, because maybe I was thinking about it. Is he? Is he not? He's saying he's a federal prosecutor. Could it be a more authoritarian than a normal lawyer? So it's a difficult question to answer, anyway."

But the jury could have credited other testimony, for example, Mekbeb's response that from March 1 through April of 2015 he believed defendant was "My federal prosecutor. My lawyer. My representative in the lawsuit." (See *People v. Young* (2005) 34 Cal.4th 1149, 1181 ["Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact."].)

Moreover, even if Mekbeb had serious doubt as to whether defendant was a lawyer when he wrote out the final checks on April 20th, the jury could have concluded he was not yet completely certain as to whether or not defendant was some kind of lawyer. Mekbeb repeatedly testified, and

16

consistently so, that defendant told him he was a "federal prosecutor," and Mekbeb pointed to that represented status as an explanation to the process server when he told Mekbeb defendant could not be located on the California State Bar Web site, and as an explanation to Finlev and Tejada as to why, while he may have had doubts about defendant's status, he did not actually know whether or not defendant was some kind of a lawyer. (See *People v. Miller* (2000) 81 Cal.App.4th 1427, 1441 (*Miller*) [" '[r]eliance may be inferred from all the circumstances' "].)

Additionally, when Mekbeb signed the attorney fee agreement he indisputably did so believing defendant was a lawyer who could represent him, and he repeatedly testified he would not have entered into the agreement had he been aware defendant was not a lawyer. He also testified that in April 2015 he had "$4,000 left to pay" defendant under the fee agreement, and when asked about the checks he had written defendant, including the ones dated April 20, 2015, Mekbeb stated they were "for legal work that [defendant] was doing representing me as a lawyer." And when Mekbeb responded to defense counsel's questioning as to whether he had told Finlev he paid defendant because "he was writing the papers to respond to" what the other side was saying—papers that were filed prior to April 20th— Mekbeb said, "I could have said that, but I still have an agreement with him. [¶] What happened with my—the client/lawyer agreement between him and Mr. Goodman? [¶] . . . [¶] [T]he fact is I hired him, I hired Jeffrey Goodman, I signed an agreement, and they start to work the lawsuit for me." Thus, Mekbeb arguably had some belief defendant remained entitled to *attorney* fees.

In other words, the evidence was such that the jury could have rejected defendant's argument that Mekbeb had *no* doubt by April 20th that

17

defendant was not a lawyer, and he therefore did not rely in *any* respect on defendant's assertions over the course of more than 14 months that he was a lawyer and entitled to be paid as such. (See *Miller, supra*, 81 Cal.App.4th at pp. 1440–1441 [reliance means the false representation " ' "materially influenced" the owner's decision' " but the misrepresentation " 'need not be the sole factor motivating the transfer' "].) It is sufficient if there is a " ' "causal connection shown between the [representations] alleged to be false" and the transfer of property.' " (*Id.* at p. 1441.) And there was enough evidence here to support a finding, based on the preponderance of the evidence, that Mekbeb wrote the April 20th check that was cashed with some belief defendant remained his lawyer or at least with some degree of uncertainty as to whether or not defendant was some kind of lawyer and entitled to *attorney* fees. (See *People v. Zamudio* (2008) 43 Cal.4th 327, 357 ["A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict."].)

We therefore conclude substantial evidence supports the jury's finding that the grand theft count was not barred by the statute of limitations.

### *The Extortion Counts*

When defendant resurfaced in April 2018, three years after Mekbeb had given him the three April 20, 2015, checks, he sent Mekbeb a "Notice of Bad Check," (some capitalization & boldface omitted) demanding payment on the two post-dated checks that were cancelled and asking that Mekbeb "resolve this matter before . . . legal proceedings" were initiated. Mekbeb ignored the letter.

Defendant followed this with an e-mail in April, again demanding payment and stating that in addition to the "financial penalties" outlined in

18

his previous letter, Mekbeb would also be "subject to prison time for fraud," up to six years—three years for each check.

In May, defendant filed a small claims action against Mekbeb.

In June, defendant sent another e-mail adding another threat, this time asking, "Are you aware that you can be stripped out of your Citizenship."

Defendant maintains that based on this evidence he was entitled to an instruction on the litigation privilege set forth in Civil Code section 47.

Civil Code section 47 states in pertinent part: "A privileged publication or broadcast is one made: [¶] . . . [¶] (b) In any . . . judicial proceeding. . . ." (Civ. Code, § 47, subd. (b).) "The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212.)

This privilege embraces communications prior to commencing a lawsuit, but only "when it relates to litigation that is contemplated in good faith and under serious consideration." (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1251 (*Action Apartment*).) No public policy supports extending the privilege to persons who attempt to profit from hollow threats of litigation. (*Ibid.*) Whether a communication relates to litigation that is contemplated in good faith is an issue of fact. (*Ibid.*) The privilege applies regardless of whether the communication was made with malice or intent to harm, and whether the alleged conduct was fraudulent, perjurious, unethical, or even illegal. (*Blanchard v. DIRECTV, Inc.* (2004) 123 Cal.App.4th 903, 920–921.)

19

Defendant acknowledges he did not request an instruction on the litigation privilege but contends the trial court had a sua sponte duty to so instruct the jury.

The Attorney General maintains defendant forfeited the issue by failing to request such an instruction. We agree.

" ' " 'It is settled that in criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence' " and " 'necessary for the jury's understanding of the case.' " ' " (*People v. Molano* (2019) 7 Cal.5th 620, 667 (*Molano*).) However, there are limits to the trial court's sua sponte duty. A trial judge "must instruct only on general principles that are necessary for the jury's understanding of the case; the judge need not instruct, without request, on specific points or special theories that might be applicable to the particular case." (5 Witkin, Cal. Criminal Law (5th ed. 2024) Criminal Trial, § 707, p. 1047.) A trial court must also instruct on a "true affirmative defense." (*People v. Michaels* (2002) 28 Cal.4th 486, 529 (*Michaels*).) However, such an instruction is "required only if it appears that the defendant was relying on the defense, or that there was substantial evidence supportive of the defense, and the defense was not inconsistent with the defendant's theory of the case." (*Ibid.*) "A trial judge has no duty to instruct, without request, on doctrines of law that have not been established by authority." (5 Witkin, Cal. Criminal Law, *supra,* § 707, p. 1048; see *Michaels,* at p. 529 [at the time of the trial, no California authority recognized a doctrine of imperfect defense of others; "[b]ecause defendant did not submit an instruction on unreasonable defense of others," he could only argue the trial court "should have given such an instruction on its own motion," but a court "has no duty to so instruct on doctrines of law that have not been established by authority"]; *People v.*

*Flannel* (1979) 25 Cal.3d 668, 680–683 ["[g]iven the undeveloped state of the reasonable belief rule, we cannot impose upon the instant trial court so formidable a duty as to conceive and concoct an instruction embodying that rule"; however, in future cases, trial courts would have a sua sponte obligation to instruct on rule when warranted by the evidence], superseded by statute on other ground as stated in *In re Christian S.* (1994) 7 Cal.4th 768, 776.)

Defendant maintains the litigation privilege "has long been the law of the state" and "courts have already discussed its application to criminal law."

While it may be true the litigation privilege has long been established—Civil Code section 47 was enacted in 1872—it is not the case that the applicability of the privilege to criminal prosecutions for extortion has been "established." (See *Michaels, supra,* 28 Cal.4th at p. 529.) Indeed, defendant cites no case applying Civil Code section 47 in a criminal prosecution for extortion. " '[A] legal concept that has been referred to only infrequently, and then with "inadequate elucidation," cannot be considered a general principle of law such that a trial court must include it within jury instructions in the absence of a request.' " (*Molano, supra*, 7 Cal.5th at p. 668; *Michaels,* at p. 529 [no sua sponte duty to instruct when at the time of trial "there was no California authority recognizing a doctrine of imperfect defense of others"].)[8]

Both defendant and the Attorney General cite to *Action Apartment, supra,* 41 Cal.4th 1232. In that case, our Supreme Court considered

---

[8] Defendant acknowledges this court is bound by Supreme Court authority (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455) but asserts the "inadequate-elucidation rule is incorrect, and the Supreme Court should revisit it."

"whether and to what extent" the litigation privilege "conflict[ed] with and thus preempt[ed] a section of the City of Santa Monica's 'Tenant Harassment' ordinance" which, in relevant part, "authorize[d] civil and criminal penalties against a landlord who maliciously serve[d] a notice of eviction or br[ought] any action to recover possession of a rental unit without a reasonable factual or legal basis." (*Id.* at p. 1237.) The court held the privilege "entirely" preempted the provision pertaining to "filing an action to recover possession of a rental unit" and "partially" preempted the "provision regarding serving a notice of eviction." (*Ibid.*)

In so holding, the high court rejected the city's argument that the privilege "does not apply to criminal prosecutions, whether brought pursuant to state statute or local ordinance." (*Action Apartment, supra*, 41 Cal.4th at p. 1245.) It observed that the city correctly pointed out "that on more than one occasion" the high court had "treated it as obvious that the litigation privilege does not bar certain government actions, including criminal prosecutions and regulatory actions brought pursuant to state statutes." (*Ibid.*) These actions had all been brought "under state laws, each of which makes clear that the Legislature did not intend its enforcement to be barred by the litigation privilege." (*Ibid.*) Local governments, said the court, "do not have the same authority to create exceptions to" the privilege. (*Ibid.*) The court then pointed out it "ha[d] observed" the litigation privilege did not "apply to the following crimes: perjury (Pen. Code, § 118 et seq.); subornation of perjury (*id.,* § 127); criminal prosecution under Business and Professions Code section 6128; false report of a criminal offense (Pen. Code, § 148.5); and 'attorney solicitation through the use of "runners" or "cappers." ' " (*Id.* at p. 1246.)

22

The Supreme Court went on to explain that "recognition that prosecutions of these crimes and specified State Bar actions are not barred by the litigation privilege does not reflect that an exception for criminal prosecutions is inherent in the litigation privilege itself. Instead, our recognition of these exceptions to the litigation privilege has been guided by the 'rule of statutory construction that particular provisions will prevail over general provisions.' " (*Action Apartment, supra*, 41 Cal.4th at p. 1246.) "Each of the above mentioned statutes," said the court, "is more specific than the litigation privilege and would be significantly or wholly inoperable if its enforcement were barred when in conflict with the privilege." (*Ibid.*) For example, the "crimes of perjury and subornation of perjury would be almost without meaning if statements made during the course of litigation were protected from prosecution for perjury by the litigation privilege." (*Ibid.,* fns. omitted.) In short, the court has "found exceptions to the litigation privilege based on irreconcilable conflicts between the privilege and other coequal state laws." (*Id.* at p. 1247.)

Thus, *Action Apartment* is by no means "established" authority that the litigation privilege applies in a criminal prosecution for extortion based on baseless and escalating threats of legal action and complaints to state and federal law enforcement by a defendant misrepresenting himself as an attorney.

Indeed, the Supreme Court's observation that "[t]he misdemeanors established by Business and Professions Code section 6128 evince a legislative intent that certain attorney conduct not be protected from prosecution by the litigation privilege"—because it would conflict with the operation of the criminal statute—is of note. (*Action Apartment, supra,* 41 Cal.4th at p. 1246.) That section provides that: "Every attorney is guilty

of a misdemeanor who either: [¶] (a) Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party. [¶] (b) Willfully delays his client's suit with a view to his own gain. [¶] (c) Willfully receives any money or allowance for or on account of any money which he has not laid out or become answerable for." (Bus. & Prof. Code, § 6128, subds. (a)–(c).) Defendant's extortionate conduct as an "attorney" was exactly that criminalized by the Business and Professions Code—it deceived both his "client" and the court, and it delayed his "client's" lawsuit for his own gain. In fact, defendant's conduct was even worse— because he also fraudulently held himself out as a lawyer. Surely if a bona fide lawyer cannot invoke the litigation privilege to defend against such conduct, a defendant who fraudulently holds himself out as such cannot invoke the privilege either.

We emphasize, however, that we need not decide, and are not deciding, whether the litigation privilege can be invoked as a defense to a criminal charge of extortion. Rather, we are deciding here only that given the lack of any "established" authority so holding, the trial court had no sua sponte obligation to instruct the jury on the privilege and defendant therefore forfeited the issue by failing to request such an instruction.

Anticipating a potential forfeiture problem, defendant alternatively argues his counsel was ineffective for failing to request an instruction on the litigation privilege.

It is well established that to "prevail on an ineffective assistance of counsel claim under either federal or state law, a defendant must show that counsel's representation fell below an objective standard of reasonableness and that counsel's deficient performance was prejudicial, i.e., that a reasonable probability exists that, but for counsel's failing, the result would

24

have been more favorable to the defendant." (*People v. Villegas* (2023) 97 Cal.App.5th 253, 266.)

A trial counsel's failure to advocate for, or make objections based on, potentially novel applications of law generally does not support a claim of ineffective assistance, and we conclude that is the case here. As we have discussed there is no authority holding that a defendant can freely commit criminal extortion if they do so by threatening an immigrant of limited education with baseless legal action and baseless complaints to law enforcement authorities. Accordingly, defendant's trial counsel cannot be faulted for failing to request an instruction on the litigation privilege. (See *Engle v. Isaac* (1982) 456 U.S. 107, 134 ["[w]e have long recognized . . . that the Constitution guarantees criminal defendants only a fair trial and a competent attorney"; it "does not [e]nsure that defense counsel will recognize and raise every conceivable constitutional claim"]; *People v. Upsher* (2007) 155 Cal.App.4th 1311, 1329 [counsel did not render ineffective assistance in failing to take certain actions regarding the defendant's prior conviction, given "the unsettled state of the law" on the issue]; *People v. Foster* (2003) 111 Cal.App.4th 379, 385 [the defendant could not establish ineffective assistance, given there was "no California authority establishing whether or not the questions were proper"].)

## DISPOSITION

The judgment is affirmed.

_____
Banke, Acting P. J.

We concur:


_____
Langhorne Wilson, J.


_____
Smiley, J.

A168757, People v. Soliman

26